### UNITED STATES v. UNITED SHOE MACHINERY CO. OF NEW JERSEY et al.

#### (District Court, D. Massachusetts. March 18, 1915.)

#### No. 301.

1. MONOPOLIES ☞14—COMBINATIONS IN RESTRAINT OF TRADE—MANUFACTURERS OF PATENTED ARTICLES.

The union in one corporation of a number of others, each of which had been engaged in the manufacture of patented noncompeting machines, but which were used successively in a manufacturing business, is not a combination in restraint of trade, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1913, § 8820).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. ☞14.]

2. MONOPOLIES ☞14—"COMBINATION IN RESTRAINT OF TRADE"—CONSOLIDATION OF SHOE MACHINERY COMPANIES.

The United Shoe Machinery Company was formed by the consolidation of a number of companies, each engaged in making patented machines for use in the manufacture of shoes, for the most part noncompeting. During the ensuing 11 years it also acquired the patents, property, and business of a considerable number of other manufacturers of different classes of machinery, all of which was used in the manufacture of shoes, and comprising a group of machines covering practically all of the operations required in such manufacture, by which means the company obtained a very large percentage of the trade in such machinery, although it appeared that neither its property nor its business was acquired by unfair means, but, on the contrary, that in most cases its purchases from

others were made at their solicitation, and that in many more cases it refused to buy the business of others which was offered. *Held*, that such facts did not characterize the company as a "combination in restraint of trade," or evidence an attempt to create a monopoly, within the meaning of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. ☞14.

For other definitions, see Words and Phrases, First and Second Series, Combination in Restraint of Trade.]

3. Monopolies ☞14—Anti-Trust Act—Manner of Conducting Business.
   Neither is illegality of the company's business shown by the fact that, instead of selling its machines, it leases the same for long terms, with a license for the terms of any patents covering parts thereof, for a royalty based on the number of pairs of shoes on which they are used, with a provision requiring the lessee to use the machines to their full capacity so far as its business warrants, nor because of further provisions, in some of the leases of certain machines, requiring the lessee to also lease other related machines from the company under penalty of cancellation of the lease, where such clause was optional with the lessee, who was charged a smaller royalty when it was included.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. ☞14.]

In Equity. Suit by the United States against the United Shoe Machinery Company of New Jersey and others. Decree for defendants. See, also, 198 Fed. 870.

James A. Fowler, Asst. Atty. Gen., William S. Gregg, Sp. Asst. Atty. Gen., Asa P. French, U. S. Atty., Edwin H. Abbot, Jr., Sp. Asst. U. S. Atty., and Allen Webster, Sp. Asst. U. S. Atty., all of Boston, Mass., for the United States.

Frederick P. Fish, Charles F. Choate, Jr., William A. Sargent, Malcolm Donald, Harold G. Donham, Walter B. Farr, and Lafayette R. Chamberlin, all of Boston, Mass., for defendant.

Before PUTNAM and DODGE, Circuit Judges, and BROWN, District Judge.

PUTNAM, Circuit Judge. Of course, a proceeding on the criminal side of the court cannot operate as an estoppel in a civil proceeding; but it may be referred to safely in an introductory way, and in explanation of questions of law to be relied on.

The general features of this case are largely stated in United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed. 481, and United States v. Winslow (D. C.) 195 Fed. 578; but there are differences, so that we will quote extensively from the bill in the present suit.

In so much of the bill as relates to the organization, we have no occasion to make any distinction between the United Shoe Machinery Company and the United Shoe Machinery Corporation, two New Jersey organizations who are made respondents; and we do not know that we will have occasion to refer to the subordinate organizations made respondents and known as the United Shoe Machinery Company of Maine, etc.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The bill alleges the organization of the United Shoe Machinery Company of New Jersey, as follows:

"Defendants Sidney W. Winslow, William Barbour, Elmer P. Howe, John H. Hanan, George E. Keith, Edward P. Hurd, George W. Brown, Wallace F. Robinson, Rudolph Matz, and others, owners, officers, directors, and agents of said Goodyear Shoe Machinery Company, International Goodyear Shoe Machinery Company, Goodyear Shoe Machinery Company of Canada, Consolidated & McKay Lasting Machine Company, McKay Shoe Machinery Company, Eppler Welt Machine Company, International Eppler Welt Machine Company, and Davey Pegging Machine Company, not being satisfied with the benefit of the lawful monopolies and rights belonging to them under letters patent of the United States and of other countries, which they had enjoyed for many years, pertaining to shoe machinery, and parts thereof, and designing and intending unduly, unreasonably, and unlawfully to extend, expand, and perpetuate said monopolies and rights, and to enhance the value thereof at the expense of the boot and shoe manufacturers and of the public generally, and to use the same as a means for unlawfully controlling interstate and foreign trade and commerce in shoe machinery to a greater extent than was warranted by said letters patent, determined to acquire a complete monopoly of the manufacture, sale, and lease of shoe machinery, destroy existing competition among the manufacturers and dealers in such machinery, and through unlawful combinations and agreements to exclude all others from said trade and commerce. For the accomplishment of this purpose they conceived the idea of acquiring the ownership or control of all concerns engaged in manufacturing and dealing in any and all kinds of shoe machinery, and then to refuse to sell or lease any of the essential machines to the manufacturer of shoes, except on condition that he buy or lease of them practically all other machinery of whatever kind necessary or useful to such manufacturer of shoes, and thereby to exclude all competition by other manufacturers of such shoe machinery and to monopolize the trade and commerce therein among the states and foreign countries. The various contracts, combinations, conspiracies, and acts hereinafter described were steps in carrying out the above mentioned unlawful project. A preliminary agreement was made, and in February, 1899, they incorporated United Shoe Machinery Company, under the laws of New Jersey, with an authorized capital of $25,000,000 ($12,500,000 preferred, $12,500,000 common), with broad powers under its charter to manufacture, buy, sell, lease, operate, and deal in and with all kinds of machinery, tools, and implements, and especially in everything in any way connected with or used in the manufacture of boots and shoes. For the stock allotted to each, and for cash, at values far in excess of real worth, four of the old concerns, to wit, Goodyear Shoe Machinery Company, International Goodyear Shoe Machinery Company, Consolidated & McKay Lasting Machine Company, and McKay Shoe Machinery Company, conveyed to the new corporation, as going concerns, their business of manufacturing, selling, leasing, and dealing in shoe machinery, including their letters patent of the United States and of other countries, and all property and rights used in connection therewith, wherever situated, and their principal owners, managers, directors, and officers became managers, directors, and officers in the new company. Stock of the new company was allotted and received as follows."

At this point the bill shows the distribution of the shares of capital stock of the new corporation among the prior corporations combined in it, or their shareholders. It alleges that the prior corporations conveyed to the new corporation their business, patents, and property rights "for the stock allotted to each and for cash, at values far in excess of real worth." No proof was offered in support of this final allegation, and it has not been insisted upon by the United States.

The bill proceeds:

"Prior to the organization of United Shoe Machinery Company of New Jersey, boot and shoe manufacturers, purchasing or leasing machines from one

of the aforesaid companies, were not compelled to use exclusively machines mentioned in the aforesaid groups manufactured by either of the other companies. For example, the shoe manufacturer who held lasting machines under lease from the Consolidated & McKay Lasting Machine Company was not required to use, in connection with that company's lasting machines, welt-sewing machines or outsole-stitching machines of the Goodyear Shoe Machinery Company, or those of any other company, and he was free to obtain such machines wherever he could procure them to the best advantage. The same was true of the trade in welt-sewing machines and outsole-stitching machines, heeling machines, and metallic fastening machines. Defendants, however, not being satisfied or contented with said portion of the trade and commerce in shoe machinery which they acquired through the organization of United Shoe Machinery Company of New Jersey, and with the intent to acquire complete control of the business of manufacturing and selling or leasing of shoe machinery among the states and with foreign countries, to exclude all others therefrom, to enhance the cost of said machines to users thereof, and to wrong and to oppress the public, discontinued the sale to boot and shoe manufacturers of each and all of the machines included in said groups of machines, and unlawfully devised, adopted, and put into effect arbitrary, oppressive, and unreasonable lease and license agreements, which boot and shoe manufacturers have been and are required to agree and conform to in order to obtain from said defendants any of the machines included in said groups."

On the whole, as the case developed, no objection was persisted in by the United States to the fact that the policy of the Shoe Machinery Company was to lease its machines, instead of selling them. It was plain that this policy was not injurious in a large sense. It enabled manufacturers of small and moderate means to embark in manufacturing to an extent which would have been impossible for them, if they had been obliged to purchase machinery, because many machines are so expensive as to lock up capital and render it dead for practical purposes of financing shoe manufacturing. It is also apparent that a portion of the conditions and provisions of leases were in use without complaint before the United Shoe Company was organized; but it is not necessary that we should detail these facts, because we must take the result of the development as to this topic, at least, as it was found at the time the bill was filed in 1911, and, while the prior condition might mitigate any complaint on that point, it cannot answer it.

The bill further proceeds as follows:

"These agreements contain provisions, not found in their former lease and license agreements, which compel boot and shoe manufacturers leasing any of such machines from defendants to agree to use exclusively one or more of the classes of machines included in said groups of machines owned and controlled by them, upon penalty of having all the machines included in said groups so leased to them by defendants immediately reclaimed and taken away and the lease and license agreements canceled. These contracts further require boot and shoe manufacturers to take each of said machines for a period of not less than 17 years, regardless of the terms of the patents relating thereto. Lessees thereunder are compelled to obtain all duplicate parts, extras, mechanisms, and devices of every kind needed or used in operating, repairing, or renewing the leased machinery from defendants, at exorbitant prices fixed by them from time to time. Many of these agreements further provide that the lessee shall, at the expiration of 17 years, and after he has paid large royalties throughout that period, if he shall then have no further use for the machines, return the same to defendants at their factory at Beverly, Mass., and shall pay to them a return charge, which in some cases amounts approximately to the original cost of building the machines. Defendants have continually, persistently, and arbitrarily enforced the provisions of said lease and license agreements by all the means in their power as against

the boot and shoe manufacturers, and have made it their general policy and practice to refuse to furnish such machines to any and all boot and shoe manufacturers who fail to comply with the terms or spirit of the provisions of said lease and license agreements, and to otherwise injure them.

"Defendants, in pursuance of their general purpose, inserted in and made a part of each lease and license agreement provisions reserving to themselves the right to forthwith terminate and cancel all existing lease and license agreements between them and the boot and shoe manufacturers, if the latter should fail or cease to use exclusively and to their full capacity machines leased or controlled by defendants, thereby prohibiting said manufacturers, not only from using competing shoe machinery manufactured in the United States, but also from using any such machinery manufactured in foreign countries and imported here for sale or lease."

There is no proof that the United Shoe Company has enforced its leases in any arbitrary or unreasonable manner. On the whole, it seems to have been moderate with reference to such enforcements, and the number of cases in which anything in the way of a forfeiture has been demanded has been so small that, on looking over the great mass of the operations of the United Shoe Company, such enforcements have been so few as to be practically negligible, and there is no evidence that the duplicate parts, extras, and other incidentals furnished by the United Shoe Company have been sold at exorbitant prices fixed by it, or that the cost involved in the return of machinery has in any way approximated its original cost, unless, possibly, in some exceptional instances which have not caught the eye of the court. We do not think the case as developed has turned on these particular allegations.

It might have been expected in a proceeding of this importance, involving so many aspects, that the parties would not, at all times, have been in accord as to the pleadings of the United States. Referring to the allegation that the respondents "conceived the idea of acquiring the ownership or control of all concerns engaged in manufacturing and dealing in any and all kinds of shoe machinery," the utmost that the case can in any event be said to show is a purpose to acquire control of certain machinery connected with bottoming shoes, or later of certain clicking or eyeletting machines; and of this the United States became during the trial so far satisfied that it asked permission to amend the above allegation accordingly. On the rules of equity pleading, however, which also are applied to some extent to pleadings at common law, an allegation of the whole field covers any part of it, and may be accepted as such without involving any variance.

Allegations such as the following, which run through these pleadings, color them all, and are to be accepted as controlling the entire bill, namely:

"Not being satisfied with the benefit of the lawful monopolies and rights belonging to them under letters patent of the United States;" "and intending unduly, unreasonably, and unlawfully to extend, expand, and perpetuate said monopolies and rights."

The bill in the same line claims that the alleged confederates had, from the outset of the confederation, taken certain action described in the bill for the purpose of perpetuating the rights they had under existing patents after those patents should expire. We are dealing

222 F.—23

now with allegations which seem to assert that the machines acquired by the corporation on its organization were covered by patents, and that its then purpose was to maintain this position, even after the then existing patents expired. This supports the proposition of the respondents that the machinery offered by the respondents was at all times protected by patents succeeding each other. At any rate, it must be accepted that, from the beginning, the machinery offered by the respondent corporation was, in all its essential elements, protected by patents, and that there has been no proof to the contrary. So that, for the purposes of this case, the machinery has been mainly, if not entirely, of that character.

To prevent possible misunderstanding of the position of the respondents in reference to the fact that the Shoe Machinery Company's machines are protected by patents, we repeat and accept what the respondents say, as follows:

"The extent and character of the rule of property established by the patent laws of the United States, under which this entire shoe machinery work from the very beginning has been carried on, is perfectly clear and definite. The industry has grown up under, and has been based upon and made possible by, the rights established by those patent laws."

The propositions thus quoted from the respondents are substantially supported by the record. It also may well be gathered from United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed. 481, that the United States, which were then free to put their case as they saw fit, thus put it with reference to the date of the organization of the Shoe Machinery Company, and thus gave it color which we are free to accept as abiding with the organization so long as effectual proof of change to the contrary was not furnished, as it was not. Under the circumstances of the case, this special observation is justifiable, notwithstanding United States v. Winslow was a criminal proceeding, because, no doubt, the natural presumption is that the United States made their case as they had reason to believe it to be. Indeed, it affirmatively and emphatically appears at various places in the bill, and it runs all through it, that all the essential interests which entered in 1899 into the combination forming the United Shoe Machinery Company were, at the time of the formation of that corporation, covered and protected by patents, and there has been no evidence that at any time in the history of the corporation there was any change from its original purposes.

It was at one time largely understood that the Supreme Court substantially held that all combinations of patents were outside the Sherman Anti-Trust Act. Bement v. National Harrow Co., 186 U. S. 70, 90, 91, 22 Sup. Ct. 747, 755 (46 L. Ed. 1058), decided on May 19, 1902, was thought to declare this view. In this case, at page 90 and sequence, some peculiar limited exceptions are referred to, as, for example, a statute requiring an inspection of burning oils and providing a penalty for its violation. The opinion then proceeds, at page 91:

"Notwithstanding these exceptions, the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that

any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal."

This impression was apparently strengthened by expressions in United States v. Winslow, 227 U. S. 202, 217, 33 Sup. Ct. 253, 57 L. Ed. 481. It is true this case also gave effect to the fact that, on the face of the combination of patents then under review, there was an effort for greater efficiency; but the opinion continues that the machines involved were patented, and it assumes that making them was a monopoly in any case, and that the exclusion of competitors from the use of them was the very essence of the right conferred by the patents. Then the opinion refers back to the Paper Bag Patent Case, 210 U. S. 405, 429, 28 Sup. Ct. 748, 756, 52 L. Ed. 1122. There it appeared that the patent in suit had been locked up by the complainant, its owner, and that the complainant had neither used it nor allowed any one else to use it. There was neither lack of means, nor any other excuse for locking up the invention, except the desire to protect other machines which the complainant was manufacturing. After some incidental explanations, the court there said:

"As to the suggestions that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."

What was said there was directly in issue.

But other late decisions of the Supreme Court seem to demonstrate that the cases we have cited do not state the whole law, but only lead up to the general rule, without showing how this general rule yields to exceptional circumstances. Moreover, this position does not give full effect to the second section of the Sherman Anti-Trust statute, which covers "every person who shall monopolize or attempt to monopolize," as well as those who combine or conspire with any other person, or persons, to monopolize. Certainly in United States v. Reading Co., 226 U. S. 325, at page 358, 33 Sup. Ct. 90, 57 L. Ed. 243, reliance was placed on Swift & Co. v. United States, 196 U. S. 375, 396, 25 Sup. Ct. 276, 49 L. Ed. 518, where a plan said to consist of many parts or elements was held to constitute a monopoly forbidden by the act. There the court observed that whatever we may think of the elements separately, when taken up as distinct charges, they are alleged effectively as elements of a scheme. It is true that in the Reading Company Case there was an underlying combination among the principal promoters of what resulted; but we find there this recognition of what may happen where there is no such combination, given in the language we have cited from Swift & Co. v. United States.

The case, however, that controls the present proceeding in this important aspect is Standard Sanitary Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107, decided on November 18, 1912. There the opinion was drawn by the same learned justice who drew the opinion in the Paper Bag Patent Case, so that we may assume that the two cases go along hand in hand. The opinion in the Standard Sani-

tary Company Case refers twice to the opinion in the Bement Case, once at page 40 and again at page 48 of 226 U. S., at pages 11 and 14 of 33 Sup. Ct. (57 L. Ed. 107). At page 48 it is said as follows:

"There was a contention in that case that the contract of the National Harrow Company with Bement & Sons was part of a contract and combination with many other companies and constituted a violation of the Sherman law, but the fact was not established and the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits. And there is nothing in Henry v. A. B. Dick Co., 224 U. S. 1 [32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880], which contravenes the views herein expressed."

Thus the Standard Sanitary Company Case, and consequently the present proceeding, were, and are, by express language distinguished from the Bement Case, and the distinction thus made is that relied upon by the United States here, namely: Instead of dealing with one or more contracts between one or more parties, incidentally made and having no relation to each other, we are dealing with a vast scheme which unavoidably affects the public interests. We need not elaborate other late decisions which indicate and enforce the proposition that a monopoly may be established in violation of the second section of the Sherman Anti-Trust Act, conforming to the explanation of the Bement Case which we have given, and without a formal combination; as, for example, United States v. Patten, 226 U. S. 525, 541, and sequence, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, United States v. Union Pacific R. R. Co., 226 U. S. 61, 85, 86, 33 Sup. Ct. 53, 57 L. Ed. 124, and Strauss v. Publishers' Association, 231 U. S. 222, 34 Sup. Ct. 84, 58 L. Ed. 192, at various points in that opinion. Therefore, in view of what we have said, it is necessary for us to go a step further and point out that we have here an organization, supported merely by a diversity of patents or machines patented in whole or in part, and inquire whether the alleged resulting monopoly is arrived at by injurious provisions contained in the licenses and leases referred to, which go beyond what the respondents might justly require.

We should now state generally that the United States claim that, while there are no contracts in form as between the different customers of the United Shoe Machinery Company, the matters are so tied together by the provisions of these licenses and leases, and the scheme created thereby is so complete, as to have the same practical effect of producing the alleged monopoly which the statute prohibits, as though there had been agreements in a multiple form executed by the United Shoe Machinery Company and its various customers. They also claim that this results in a scheme such as we have already referred to. The allegations in this particular are for a large part of a very general character, and it may well be doubted whether the larger portion of them are not so general as to fail to require our attention according to the proper rules of pleading. Perhaps, however, on that score the variety and number of the leases, and of the various provisions thereof, are so great, and the parties with whom the United Shoe Company have been dealing were and are so numerous, that it would be unreasonable

to require the complainant to set out the facts in detail. We have, however, given the language of this part of the bill verbatim, and we can approach it with the general statements substantially in effect that there is nothing in the terms of the leases justifying any allegation indicating a purpose to enhance the cost of the machines to the users thereof, to wrong or oppress the public, or to impose any arbitrary, oppressive, or unreasonable terms.

The bill also alleges that these provisions are not found in the earlier leases and agreements existing prior to the organization of the United Shoe Company. Whether they were or not we regard as immaterial, except as excusing the respondents from any wrongful intention, because we agree with the United States in the proposition that whether or not the conduct of the respondents is in fact in restraint of trade does not depend on the effect of any element considered singly, so that every element considered singly may be wholly innocent; but the question of an existing monopoly, or an intended monopoly, is to be determined by the effect of all the elements which are in fact combined.

The bill gives us no particular rule by which we can determine whether the provisions of the leases and licenses referred to are abnormal, or unjust, or unreasonable, nor where, nor how far, they are within the allowances which the law makes for the protection of legitimate trade and manufacturer. We have nothing bearing directly on this topic except the apparent admission that the common provision contained in the leases and licenses, understood and called the "full capacity clause," standing alone, would be valid, and except, also, expressions like those found in Eastern States Lumber Association v. United States, 234 U. S. 600, 609, 34 Sup. Ct. 951, 58 L. Ed. 1490, decided on June 22, 1914, summing up the previous decisions of the Supreme Court, that the Sherman Anti-Trust Act, "in its proper construction," "was not intended to reach normal and usual contracts incident to lawful purposes and intended to further legitimate trade."

Nevertheless, we fail to find, in the development of the United Shoe Machinery Company and its operations, any support for the alleged charges in the bill of intended oppression, arbitrary conduct, or anything of that nature, especially so far as any allegations cover any attempts to destroy or cripple competitors. Looking at the great mass of facts proven in the case, and the immense number of transactions of the United Shoe Machinery Company, the evidence offered in that direction is so ineffectual that its weakness furnishes of itself satisfactory proof against what was intended to be established thereby. We find no evidence of what was shown especially in the Tobacco Company Cases, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, namely, a purpose to destroy what could not be acquired by straightforward methods. The fact that the United Shoe Company has acquired so large a percentage of the business of the country to which it devoted itself comes so largely from the use of extraordinarily competent methods as to shut out from the eyes of the impartial investigator suggestions of other methods. So we lay aside that part of the case, and deal only with the proven facts, and the legitimate results of those facts,

with little consideration, however, for any charges in this connection, or elsewhere, of intended oppression or unreasonable course of procedure, or of results which can be attributed to any unworthy motive. This, however, according to the well-known rules of law, does not necessarily relieve the respondents from what actually resulted from whatever they did, or from being responsible for these results so far as they might be expected to be foreseen.

The result of our consideration of what appears in the bill on this topic, and of the very general expressions found in it, and found in the authorities applicable hereto, have rendered necessary that we set out, as we will do with very considerable fullness, the claims of the respondents as to the nature and amount of the operations of the United Shoe Company, for the purpose of making clear the just amount of flexibility of the provisions of the leases and licenses as complained of by the United States, which should be regarded as applicable to what is admitted, or must be admitted, to be legitimate for the business of the United Shoe Company.

We may well call attention to some particular provisions in the leases and licenses, although they do not carry us very far towards solving the whole case before us. Among other provisions is one requiring lessees to use exclusively one or more classes of machines included in groups of machines, under penalty of having all the machines included in those of other groups reclaimed. The licenses also cover periods of not less than 17 years, thus regardless of the unexpired terms of the patents relating thereto. Also they cover a requirement that the lessees obtain from the United Shoe Company all duplicate parts, extras, mechanisms, and devices used in operating, repairing, or renewing. With this there is an allegation that the parts can be obtained only at enormous prices. The record, as we repeat, gives us no definite rules for determining how far each of these provisions is legitimate, or otherwise. It nevertheless appears that the prices for duplicate parts, etc., were never exorbitant, but that the contrary is true. Also it appears that, to a large extent, the requirement that duplicate parts, etc., should be obtained from the Shoe Machinery Company is for a large part reasonable. This and some other provisions may relate to the standardizing, and to continuous harmonious use of a long line of successive machines, for which standardization and harmonizing lie at the foundation, as they are the very like of some modern systems of production. Other allegations with reference to this topic are either frivolous or too general to support of themselves any practical results. Consequently it becomes necessary for us to state the case more fully as claimed by the respondents, in order to attempt to furnish some tests as to how far provisions of the kind complained of are legitimate with reference to some portions of the business of the Shoe Machinery Company which every one must admit it is entitled to pursue. The positions and peculiarities of the case are so extensive and novel that it is impossible to apply with any satisfaction any ordinary tests of what are reasonable and normal, and what are unreasonable or abnormal, requirements of the leases or licenses, without a particular view thereof. The case in these respects, as stated by the

respondents, has so many phases that the determination of what portions of the provisions of the leases and licenses are normal, legitimate, or reasonable as applied thereto is a complex topic, requiring much investigation, supported with great patience and care. What we now extract from the positions of the respondents in reference thereto is substantially supported by the record.

These extracts commence with the fact that the circumstances appearing in the well-known Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and the American Tobacco Company Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, are so far unlike the circumstances appearing here that no particular assistance can be derived therefrom with reference to what conditions or requirements should be normal, legitimate, or reasonable here. The respondents say:

"This particular business of shoe machinery started about 1860 with the McKay sewing machine. There are men now alive who saw the first McKay machine, introduced about 1860. At the time the machine was invented by Lyman Blake, there was not in a shoe factory a single machine outside of the sewing machine for stitching the uppers, except a machine for making strips of outsoles and a knife organized into a frame which roughly shaped the outsole. There were a few crude pegging machines in use. There was not another machine, and shoes were made absolutely by hand. The business was insignificant as a whole even, and the individual units were most insignificant. McKay had $140,000 when he bought it. He thought that it was a perfect machine, but his $140,000 was gone before he was able to sew a shoe on it commercially. And that is the history of all these machines. They have been most expensive in their development. One unexpected failure after another has broken the hearts of the inventors and promoters before success was attained."

"Then came the Civil War, and the demand for shoes for the soldiers was such that the McKay machine was able to get a start which otherwise it might not have gotten."

"At the moment when McKay started to put this machine out, Elias Merwin and McKay together invented for this business the royalty system, and that system has prevailed throughout the shoe machinery business from the beginning. It was a system of leasing machines, adopted in order that the shoe manufacturers might be induced readily to take the machines. Because in the case of each new machine it was all an experiment, the shoe manufacturers did not dare to take such machines and invest their capital in them. They did not have the capital to invest. This policy was satisfactory to the last degree, and from McKay's time to the present day the royalty and lease system has been the prevailing and characteristic method of the shoe machinery business, so far as the great variety of elaborate and refined machines which have followed the first McKay machine are concerned. One thing which the government asks in the case is that the leasing system which has prevailed from the start in this industry should be destroyed. If the court should declare illegal, as the United States ask it to do, the protective clauses in our leases which we have put there to make the system safe and practicable, the leasing system would have to go."

"There are two important aspects, at least, in which this shoe machinery business is unique. One is that, in every single step in this business up to the point where to-day we are building 350 machines, the machines have been patented machines, always patented, and likely to be patented for an indefinite time in the future, because this art is not yet exhausted. Thirty-five millions of dollars of the property of the Shoe Machinery Company is in the hands of these shoe manufacturers. It finances them to that extent. It keeps those machines in repair, so that the shoe manufacturers have no question of maintenance—no cost of maintenance to deal with. It sees that information calculated to make the operation of the machinery more effective is collected

and disseminated throughout the factories. The shoe manufacturers who deal with our company do not have to be on the watch to get the best possible machines. They know that the defendant will supply them with the best. They know that their machinery is the best in the world, and that, if better is devised, they will surely have it. There is nothing for them to look after except the question of labor, the purchase of material, the design of their goods, and selling them. It is with this business, not with any other, that the court has to determine whether what these respondents have done, what contracts they have made, have been in the normal, orderly, natural line of development."

"McKay had his lasting machine, Thompson had his lasting machine, soon Copeland came along with his lasting machine—all patented; and the impression right straight through of those working in this art who were most intelligible was this: That you might do many things with machinery in shoe manufacturing, but you never could last by machinery, because you are dealing with leather, which is a most difficult thing to deal with. It is so expensive that every scrap should be saved, and none injured. No two adjacent centimeters of leather are the same in character and condition. In flexibility and capacity for stretching no two spots are alike, the surface character constantly varies, and yet you must make a finished shoe without waste or loss and as perfect as possible, and the two shoes of every pair must be perfectly matched. It was the general belief that the lasting machine was an idle dream."

"But the lasting machine has come; and so has every other machine that was required in this industry. The 150 processes that are employed in making shoes are all done to-day by machinery. It is only a short time ago that there was some talk about cutting out the uppers; men said that you never could do that. Human intelligence seemed absolutely essential for the work. Now we have a machine that doubles the efficiency of the human operator in cutting or dieing out the uppers, and does it much better. This is the clicking machine."

"Moreover, the No. 5 laster of to-day is of such a character that the Ideal and the Chase of 1899 are practically obsolete machines. The welter and stitcher of to-day are enormously more useful, efficient, and economical than those of 1899, as the record shows. The rough rounder has been perfected; and so it goes right straight through with every machine in use in 1899, as to all of which there have been a long line of patented improvements, one succeeding another at frequent intervals, every one of which does something that previously was done by hand, or was not done at all. So that to-day you have a completely developed organization of machinery adapted to the manufacture, under the most favorable conditions, of the shoes that the public require. If the requirements change, the machinery is at once changed to meet those new requirements, and there has been a continuous and large gain in economy and efficiency.

"We talk chiefly about the welt shoe, because that is the most important shoe of all, and the one to which our business most largely relates. There were only 17,000,000 of them made in 1898, or less than 10 per cent. of all shoes made. In 1910 there were made over 86,000,000 pairs, and the proportion of welt shoes to all shoes made has been steadily increasing. And why this increase? Because we have given to the shoe manufacturers, between 1899 and the present time, better machines and radically new machines, which enabled them to make those shoes successfully and at a low cost. We are solely responsible for this entire development. The whole credit of it belongs to us."

"Now it is not unreasonable to look at this complex and complete shoe machinery system in this way. Take a screw machine. There there is an organization on one frame which feeds the bar, cuts off the right length, puts in the screw thread, makes the point, makes the head, and cuts the slot in the head, thus making a complete screw. The manufacture of a shoe in a modern factory is practically a unitary operation, like the making of a screw; every one of the many steps being co-ordinated to the others, as if all were taken in a single machine. Everything is aimed at one product, and every single machine is definitely related to the machines that follow it, and to the

machines that are back of it. These machines, that we have talked about as being classified into 'departments,' cover sometimes machines of one department 'tied' to those of another; yet there is no consecutive relation of one department to another in the order of use of the machines in making a shoe, but you start in with one machine from department 'A,' and take the next from department 'D,' and then one from 'C,' and then one from 'E,'—the result being that, when you get through, they have all been interwoven, and the sequence worked out, not department by department, but one machine after another, in any order as far as the departments are concerned. That is, the whole is a continuous process, aimed at one unitary result; and each of the machines, whatever the distribution among the different departments, is organized to succeed the prior machine efficiently, and to prepare the shoe for the next machine. Any one of the machines may spoil a shoe; and the result is that one of the great problems of this art has been to organize each machine, so that not only will it do its work without injury to the shoe, but that there will be no difficulty when you come to the subsequent machines. The work of each machine must be done so that the next machine will work with the required accuracy."

That the whole system thus described, past and present, is, and has been, supported and covered by patented machinery, is shown by the extracts we have already made in that connection.

What we have submitted about the leasing system, and the propositions of the respondents which we have cited, and which cover so large a field, constitute an organization so successful in its operations, continuing so long a time, and so harmonious in its major parts, that anything which would bar out provisions in the leases and licenses necessary to the maintenance thereof must be admitted to be injurious to the manufacturers of shoes, as well as to the manufacturers of machinery, with regard to what each justly desires to accomplish. However, the numerous provisions prevailing in a very considerable variety of leases and licenses, in a very considerable variety of forms, involve so much investigation and so much study that that investigation and that study should not be claimed or expected from any court of justice as primary work; and it should first be taken in hand by a master. This proposition, moreover, is enormously enforced by the systems of standardization, and of other special peculiarities, involved in the enormous work of repairs, and incidentally of supplying parts, which the Shoe Machinery Company is now accomplishing at important, but distant, parts of the United States, at an annual expense said to be in the employment of over 600 men, giving their services exclusively thereto, and all to the unqualified satisfaction, and the very great saving of time and expense, of the shoe manufacturers' industry. The better practice is to refer all such matters to special masters.

In this connection we make no special reference, and have come to no conclusions, in regard to the effect on the pending case of the legislation of Congress enacted since this case was submitted to us, nor with reference to the question whether or not the rights of the parties affected by this legislation would require supplemental pleadings. All such matters would primarily be a part of the special master's finding, if appointed.

We are brought next to a series of independent transactions on which the United States rely, relating to the acquisition of, and control by, the United Shoe Machinery Company of certain businesses,

alleged to have been acquired for the purposes of destroying competition, and thus extending the monopoly alleged in the bill, and covering various periods from March, 1899, to the time of trial, amounting, by the schedule given us, to something more than 50 instances. Some of these on their faces are only "efforts after greater efficiency," as suggested in United States v. Winslow, 227 U. S. 202, 217, 33 Sup. Ct. 253, 57 L. Ed. 481, already referred to. Those that remain which are of any consequence are connected with the acquisition of patents, either directly or indirectly, and are covered by what we have already explained. Of this latter class, so far as we can understand it, is the acquisition of the capital stock of the Goddu Sons Metal Fastening Company. This case is worthy of being treated as a typical one. The transaction occurred in March, 1899, the month after the United Shoe Machinery Company was formed, and more than 11 years before this bill was filed. It related to patentable inventions for metallic fastenings. This transaction seems to be disposed of by the general propositions we have already laid down about patent rights. It also involves a complaint several times made that the United Shoe Machinery Company has taken agreements from inventors barring them from competing with it; but such agreements are legitimate in connection with sales so far as they run parallel to the sales, or wherever they avoid unnecessary competition. The law on this point, within this generation, has been extensively altered and broadened, so that now covenants of this kind may be taken coextensively with the breadth of the trade bargained for in connection with them. So far as we have been able to discover, the various agreements of the character spoken of, and included in the prosecution, have been no broader than the law now allows. There may be some minor exceptions, but they have not been brought specifically to our notice.

We come now to the transactions with Thomas G. Plant as alleged in the bill. The real life of this transaction is in what we have said about the patent rights involved here, and about the provisions of the leases and licenses. Without those it would be impossible to construct any case of restraint of trade under the Sherman Anti-Trust Act mapped out by the bill we have before us. Without them there can be no illegal structure whatever. All the property, including that acquired from Plant personally, covered by these matters, has been broken up and lost sight of as an entity, except only the shoe manufacturing business, the control of which was acquired by the control of Plant's shares of stock in the T. G. Plant Company, while the shoe manufacturing business is not within the purview of this prosecution, because there is no claim of a monopoly acquired in that occupation. Whatever else was acquired from Plant was either patented machinery, or patents, or inventions which stood for incipient patents. So much, therefore, of the property acquired from Plant, except the shoe manufacturing business property, is subject to what we have already said about patents, and the provisions contained in the leases and licenses we have referred to, incidental thereto. Moreover, as to all of these incidental matters, the learned counsel for the complainants said as follows:

"The leasing system in and of itself is not a violation of law; the acquisition of competitors was not a violation of law; the threats and intimidation of competitors did not constitute, in and of themselves, a violation of law; but when all of these things are taken together they form an unlawful plan; therefore the plan will make the parts unlawful; so that if we started in 1899 with a lawful combination, and that combination is used to build up a monopoly, we see no reason why the court cannot go back to the original combination, and separate it for the purpose of restoring competitive conditions, because that combination has been used as an instrument for monopolizing the business."

This can justly be construed as a proper admission that the subject-matters submitted by the bill are to be taken substantially as a whole; so that, if the fundamental matters, which lay at the foundation on which the structure was intended to be built, go out, the whole goes out. The court is not called on to reconstruct what was intended to be built by the United States, if the most essential parts of that structure have disappeared. It is well to observe that, to a stranger, the transaction with Thomas G. Plant seems a very large one; but, as compared with the manufactured product of some of the witnesses who testified in the case, it was a minor thing, and particularly so when compared with the product of 86,000,000 pairs of welt shoes in 1910, and as compared with the great transactions to which this prosecution relates.

There have been many unthinking criticisms of the respondents in this case, both federal and state, some semiofficial, and some personal, and therefore irresponsible; but the conduct of this long and laborious trial before this court has been a model for those who witnessed it. It has been conducted with extraordinary persistency and ability, but with fair and open hand, and constantly with that courtesy due the counsel and this tribunal.

The court having carefully considered the pleadings of the parties and their evidence, and heard the counsel, it is ordered, adjudged, and decreed that the bill of the United States herein be dismissed.

DODGE, Circuit Judge. 1. United Shoe Machinery Company of New Jersey, organized early in 1899 by consolidation of the properties and business of several constituent companies, is charged to have been formed in violation of the Anti-Trust Act.

This claim is based on two alleged grounds: (1) That it destroyed competition between the component companies; (2) that it was brought about with an unlawful intent on the organizers' part to destroy such competition and to use the consolidation as a step in carrying out an unlawful project formed by them to acquire a monopoly. (Petition, pages 18, 80, of record.)

Has the United States proved that such destruction of competition resulted from the consolidation as made it a combination in restraint of trade? Taking the facts to which the evidence relates in order of time, this is the first question presented.

The restraint or monopoly alleged in the petition is restraint or monopoly of interstate commerce in "any and all kinds of shoe machinery"; i. e., in shoe machinery generally.

But it appeared early in the trial that no such charge could be

proved, because neither the business of the component companies in 1899 nor that of the United Shoe Company from its beginning until the bill was filed related to "all kinds of shoe machinery." Both were always limited to certain kinds only. This was finally conceded, and the field of trade in shoe machinery with which this case is concerned limited by concession of the complainant's counsel to machines of the following kinds: (1) Lasting or "pulling over" machines, used for adjusting and attaching the upper of a shoe in process to a last; (2) machines for preparing bottoms and heels and fastening them to uppers; (3) machines for finishing bottoms and heels after they have been so fastened; (4) eyeletting machines for inserting eyelets in uppers; (5) "clicking machines" for cutting out uppers. The "shoe machinery" as to which restraint or monopoly is charged, therefore, includes machines of the above kinds only, for the purposes of all questions hereinafter considered. It is to be noted that such machines are insufficient for the making of a complete shoe, and that no attempt to control machines for stitching uppers is charged.

We are concerned only with the first three of the above classes, so far as regards the above consolidation in 1899. None of the constituent companies then made or dealt in eyeletting or clicking machines. These originated with the United Company. It introduced and developed them later on, at different times during the development of its own business after 1899. Its eyeletting machines were first produced about 1902; its clicking machines in 1908 or 1909.

The United Company was formed February 7, 1899, taking over, in exchange for its own stock, or for cash, or both, the business and property of each of the following concerns: Goodyear Shoe Machinery Company and International Goodyear Shoe Machinery Company (both in the same line of business and hereinafter together called Goodyear Company); Consolidated & McKay Lasting Machine Company (hereinafter called Consolidated Company); McKay Shoe Machinery Company (owning and controlling Davey Pegging Company and hereinafter called McKay Company). From money obtained by issue and sale of other shares of its own stock it bought in March, 1899, the stock, business, and property of the Eppler and International Eppler Welt Machine Companies. These, though strictly acquisitions of the newly formed United Company, after its formation, may, for the purposes of the present question, be regarded as constituent companies.

To allegations found in the petition (page 18) that the business and property of the Goodyear Company, the Consolidated Company, and the McKay Company were taken over by the United Company "at values far in excess of real worth," reference is made at this point only in order to state that no proof of any kind was offered in support of them, it was not argued on the petitioners' behalf that they were true, and they therefore require no further notice for any purpose in the case. There can be no doubt that each concern had an established business already of great value and possessing great possibilities of development, or that each also owned patents and property of very great value in connection with its business.

Up to the time of their union each constituent concern had been

dealing, generally speaking, in a line of shoe machinery for the most part distinct from that dealt in by the others. Thus the Goodyear concern's business had been that of making and dealing in welt-sewing and out-sole stitching machines and auxiliary machines for use therewith, all designed for the manufacture of Goodyear welt shoes; also one kind of lasting machine, called the "Ideal," designed for lasting women's welt shoes. The machines of the Consolidated concern were lasting machines of three kinds, designed respectively for lasting men's welt shoes (this was called the "Chase"), heavy metallic fastened or pegged shoes, and McKay sewed shoes. The machines of the McKay concern were heeling machines, metallic fastening machines, and Davey pegging machines. The Eppler machines were welt-sewing machines and certain auxiliaries therewith used in making welt shoes (not Goodyear welts). After the union the United Company proceeded to make and deal in all the above machines.

It is here to be noted that the Goodyear welt method is only one of several methods of uniting the upper and sole of a sewed shoe. This method was from the outset in direct competition with the McKay method, and it has so continued until the present time. The Eppler welt machine was for doing the same thing by still another method. As the McKay method is and has been open to all the world, shoe manufacturers are and have been always able to obtain machines for sewing uppers, and machines (i. e., McKay sewing machines) for attaching bottoms to uppers, independently of the United Company or any of its constituent companies.

The various machines produced as above by each constituent concern were, as the petition alleges (page 15), all made "under letters patent of the United States and of other countries." The patents belonged to the respective concerns and covered improvements from time to time embodied in each machine during the course of its development by the concern producing it. Each concern had so far developed and improved its own machines that they were, in 1899, the machines principally in use by shoe manufacturers throughout the United States, in doing the respective kinds of work for which each was adapted as above. All the patents referred to passed by the consolidation to the United Company. Each concern had further improvements upon its machines under trial, and all the rights in these inventions also passed to the company.

The combination was not unlawful so far as it did no more than put the different groups of noncompeting patented machines into one control. United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed. 481. It was not unlawful unless, to an extent injurious to the public interest, it destroyed competition. In support of the charge that there was such destruction of competition, the United States contends that before the combination (1) the Goodyear Company and the Consolidated Company were competing in lasting machines, and (2) the Goodyear Company and the Eppler Company were competing in welt-sewing machines. Unless the termination of such competition as existed between these concerns in respect of these machines made the combination unlawful, it was not unlawful because of any destruction of competition involved in it.

(1) As to the alleged competition in lasting machines, it is not claimed that there was any, so far as two of the three kinds made by the Consolidated Company are concerned. These are the "McKay-Copeland" laster for lasting heavy metallic fastened or pegged shoes or brogans, and the "hand-method McKay" laster for McKay sewed shoes; and neither of them could be used to last welt shoes, for which purpose alone the Goodyear Company's "Ideal" laster was adapted. The only question here is whether the latter machine can be regarded as competing with the remaining laster of the Consolidated Company (the "Chase"). With still another laster with which the Consolidated Company was experimenting in 1899, for use on welt shoes, we are not here concerned, because, though this laster was afterward further improved, developed, and finally furnished to users by the United Company, it had not been made an article of commerce in any practical sense when that company was formed.

There is no proof of any actual use of the "Chase" laster otherwise than for its intended purpose of lasting men's welt shoes. It could not work well for use with the lighter leather whereof women's shoes are made. The "Ideal" laster, used almost exclusively for its intended purpose of lasting women's welt shoes, could not be relied on to work well with the heavier leather whereof men's shoes are made. The proof relied on to show that it competed with the "Chase" went no further than to show that a number of "Ideal" machines, small in proportion to the total number then in use, were being used in a few factories on men's shoes, notwithstanding their want of adaptation to such use. That there was any attempt to put either machine into the market as against the other does not appear. No competition between the two in the usual sense of the term is shown. After the consolidation, by the addition of a patented "hold-down attachment" added by the United Company to the "Ideal" in 1901 or 1902, some of the defects referred to were removed, but not until then can it be said to have been commercially successful for work on men's shoes. Before this improvement, it possessed at most a limited possibility of such use. I am unable to consider it established that competition in any practical sense was destroyed when the United Company became owner of both machines.

(2) As to the alleged competition in welt-sewing machines, the question is to what extent the Eppler welting machinery can be regarded as competing with the Goodyear welting machinery. Outside of that produced by these two concerns, no other welting machinery appears to have been on the market at the time.

The Eppler machines were adapted to produce men's thick-soled welt shoes only. They could not produce women's welt shoes (except perhaps those having the thickest soles), nor turn shoes of any kind, nor Goodyear welt shoes, either men's or women's, because of the difference between the respective machines in the character and position of the seam left in the inner sole of the shoe. The Goodyear machines could produce shoes of all the above kinds. The differences referred to resulted from differences in the character and operation of the machinery belonging to the different systems. These differences in character and in possible field of use had resulted, when the

United Company was formed in 1899, in the fact that over 2,500 Goodyear welting machines were in use as against 30 or 40 Eppler machines; one-third of these being used in the factory of the president of the Eppler Company. The evidence leaves me unable to believe that the possible field of competition between the two machines was large enough, or any actual existing competition significant enough in amount, to warrant the conclusion that the acquisition by the United Company of both machines involved such destruction of competition as rendered it unlawful. The Eppler machines were not suppressed by the United Company. It continued to supply them until the progress of improvement in such machinery superseded them. The patents covering them have long since expired, and it is open to any one to make and use such machines if he desires. There is no present monopoly in them, and no action taken by the court could restore them to the field of competition, or encourage or create competition by them.

Nor, if such competition as is shown to have existed between the "Chase" and the "Ideal" laster be taken together with that shown to have existed between the Eppler welting machinery and the Goodyear welting machinery, do I find it credible that the avoidance of both amounted to a consideration of any substantial importance, so far as the formation of the United Company was concerned. No reason appears for supposing that the real purpose for which the constituent companies were brought together, as disclosed not only by the evidence regarding all the circumstances as they existed in 1899, but by the evidence as to the course of development thereafter pursued by the United Company, was other than that stated in a circular letter to the Goodyear stockholders issued February 8, 1899, the day following the organization of the United Company. (Petitioner's Exhibit 152.) This dwelt upon the advantages to be secured by putting into one control "the most efficient types" of shoe machinery. In United States v. Winslow, above cited, which was decided more than a year after the present bill was filed, it was said that the combination here in question was, on its face, "simply an effort after greater efficiency," and the legality of combination for such a purpose is fully recognized.

Under their respective patents upon the "Chase" and the "Ideal" lasters there was litigation pending in 1899 between the Consolidated Company and the Goodyear Company, each claiming that the other's machine infringed its patents. Also under the patents covering their welt-sewing machines there was similar litigation pending between the Eppler Company and the Goodyear Company. A result sought to be attained by both parties to these controversies, and accomplished by them through the acquisition of all the patents by the United Company, was the termination of all this litigation. Reference is made below to other later acquisitions by the United Company, an important feature of which was that litigation, troublesome and expensive on both sides, was avoided or terminated. In so far as any of the defendants' transactions were in order to accomplish results of this kind, it cannot be said that their purpose was unlawful.

For the reasons stated, I am unable to find the charge that the United Company was unlawfully formed because of competition which it de-

stroyed sufficiently supported by the evidence. It would, in any case, be difficult to regard this as sufficient ground for a decree dissolving the company into its component parts, under a bill not filed until more than 12 years had passed since the combination complained of was accomplished. During this period, as the evidence shows, investments of a very large amount had been made, not merely by the defendants, but also by the outside public, in the extension and development of the company's united business, the component companies passed out of existence, and the machines as made by them in 1899 were so far developed, improved upon, or added to by the United Company as now all to have become obsolete. To put the parties or the public back into that state of the prior art which existed in 1899 is, of course, an impossibility.

2. Coming next to the question whether or not it has been proved that the United Company was formed with an unlawful intent on the part of its organizers to destroy competition in the future and use the consolidation they then effected as a step in carrying out an unlawful project to establish a monopoly, we are brought to the consideration of the acts and doings of the United Company, or of the other defendants through its means, from the time it was formed until the filing of this petition in December, 1911. It appears that the United Company itself, and what has been done in connection with it during that period, has been under the control, speaking generally, of the same defendants who brought about its formation in 1899. Of their actual intent in forming it, and in taking the various steps which they have taken as above in connection with it, there is no direct proof overcoming their denial that it was such as the petition charges, and no way of judging, except from the necessary results of all the steps proved to have been taken by them, as a whole.

But it is important at this point first to determine how far certain allegations of the petition, which characterize the defendants' alleged project and their motives for forming it, have been sustained by the evidence. These are found on pages 15 to 17 of the record, and they are in substance that the component companies were, in 1899, manufacturing their respective machines and parts thereof under patents, that "many of the basic patents on the principal machines were about to expire," that their manufacture and use was thus about to become open to the public "in the near future," and that the defendants, not being satisfied with the rights they had enjoyed under the patents and intending to expand and perpetuate them to the public detriment, devised the alleged project of acquiring a monopoly which the petition thereafter describes.

This trial began on May 20, 1913. On June 27, 1913, the petitioner, having introduced substantially all its other direct evidence, stated that it desired to offer proof in support of the allegations just referred to, but was not then prepared to go into the matter.

By consent, an order of reference to a Special Examiner was thereupon entered (pages 262 T, 1996) for the purpose of taking such evidence as either party should offer regarding those allegations, out of court. Such evidence was required to be completed by October 11, 1913, but successive extensions of the time were afterward found nec-

essary and allowed by consent. Before the examiner, the petitioner did not complete its direct evidence until October 6, 1913, and the evidence on both sides was not completed until November 19, 1913.

At the final arguments, however, on June 2, 1914, the statement was made by petitioner's counsel that so many machines and patents were involved that examination of more than a very few had been impossible. It seems obvious, therefore, that the allegations in question could not have been founded, when they were made, upon any adequate or complete investigation of the facts.

Nor can it be said that they have been sustained by the evidence before the examiner. It seems unnecessary to spend time in considering what patents could and what could not properly be regarded as "basic," in view of the fact that, of the patents principally relied on as such by the petitioner, those protecting the welter and stitcher of the Goodyear Company, there were two, one upon its welter, the other upon its stitcher, which ran until 1908 and 1909, respectively. The petitioner's final position, indeed, as to what was proved by the evidence before the examiner, was by no means that taken in the allegations referred to, but was only that the two machines above mentioned, and others protected in 1899 by patents not insisted on as "basic" patents, became free to any one to make or use—without any of the patented improvements added to them by the United Company since 1899, but nevertheless capable of successful commercial use—before the filing of this petition in 1911. In view of all the above, I must regard the allegations here in question as not sufficiently supported by proof, and hold that no such motive is shown to have prompted either the organization of the United Company, or any of its subsequent doings. The effect of the evidence and of the petitioner's argument is to show that Goodyear machines of the old type are capable of commercial use and could have been made by anyone who chose to make them. That, after the expiration of the two so-called basic patents, machines constructed according to them were not used, is sufficiently accounted for by the superiority of the newer machines which the defendants had introduced. For that reason the older machines did not enter into competition with them, and the defendants cannot be charged with suppressing such competition.

3. The combined business of the component companies, as conducted and developed since 1899 by the United Company, related most largely to the machines used in producing welt shoes. The use of such machines (and thereby the production of and demand for such shoes) is shown to have been very greatly promoted by patented improvements made upon the machines of 1899 by that company, greatly increasing their efficiency and capacity, and by improvements effected by that company since 1899 in the methods of manufacturing them. It appears that the total number of welt shoes produced in this country in 1899 was about 17 million pairs, and in 1910 about 86 million; the total production of all kinds of shoes increasing during the same period from about 175 to about 280 million, and the Goodyear welt shoe being all this time in direct competition with the McKay sewed shoe.

It is further shown that the above improvements in the machines

222 F.—24

and their' manufacture were accomplished by means of constant investigation, experiment, testing, and invention by competent experts employed by this company, involving a very large expenditure on its part. These efforts were directed, not only toward making each machine as efficient as possible, by itself, but also toward increasing its efficiency for so performing its own operation upon a shoe as best to combine it with the work upon the same shoe by the numerous other machines required for performing the remaining necessary operations—in order that all the many successive operations performed should co-operate toward the most economical and efficient accomplishment of the best final result in product. And besides thus developing and improving the machines of 1899, the company kept pace with the requirements of manufacturers by the invention and production of many other machines or improvements, unknown in 1899, as the need for them became apparent.

There is no question that the above-described development of the United Company's business has resulted in a very great commercial success. Its machines, as was the case with those produced by the component companies in 1899, have ever since been those which shoe manufacturers in general can use to the best advantage and therefore prefer. The increase in the number of its machines in the hands of users has been very large. Nor is there any question that of all the machines, of the kinds to which this case relates, in use when the petition was filed, those of the United Company constituted all but a very small proportion.

It is nevertheless true that, considering the whole field of machinery for stitching together the bottoms and uppers of shoes, there has all the time been free competition. The use of other machinery to accomplish the purpose has always been open to shoe manufacturers. In that part of the field of trade in shoe machinery to which the case is now limited as above, the defendants have been not monopolists but competitors. Their only means for holding the field have been legitimate means—better machines. Their specialization in machines for bottoming shoes, and not a monopoly of such machines, has been the cause of their success.

No support is found in the evidence for the charge in the petition (paragraph X) that "enormous and unreasonable profits" have been made. This allegation is made in connection with, and apparently depends upon, the allegation of which, as above stated, there is no proof —that the properties combined in 1899 were taken over at excessive valuations. Nothing shown by the evidence warrants the conclusion that profits unreasonably out of proportion to the extremely large cost at which the business has been developed and is maintained, the great investment of capital it has required, and the enterprise, inventive skill, and business ability devoted to it, have been realized. Nor has it been made to appear that the charges made for the privilege of using the machines are exorbitant or unreasonable, especially in view of the great benefit to manufacturers using them, in lessening their cost of production.

If there is any sense in which the result attained as above can be called a "monopoly," it does not follow, in view of the circumstances

shown, that the defendants have either restrained trade or been guilty of monopolizing or attempting to monopolize within the meaning of the act. Nor can I regard the case as one in which any presumption arises, from the fact that so large a proportion of the users of these machines use the defendants', that the defendants have committed any of the above forbidden acts in accomplishing the above result. The proof is too complete that it has been in fact reached by the use of methods entirely lawful, the leading features whereof are below indicated. As has been said, the field they have occupied is a special field, and the product for which their machinery is adapted is of higher price and quality than the product of the machinery of others.

The business which the defendants have developed and established is not and has never been one in which everybody might freely engage. No one else could lawfully make or use machines containing improvements covered by the defendants' patents. Nor can it be said that the demand for such machines which they have supplied existed independently of the defendants; on the contrary, they have created it by the new methods of shoe manufacture which their improvements have educated and enabled manufacturers to follow. It cannot justly be said that the case is one in which a field of commerce normally belonging to all has been captured by a single concern. The principles applying in such cases cannot justly be applied here. In so far as the defendants' occupation of the field has been due to the greater desirability of their patented machines, and to the superiority of their methods of making and supplying users with such machines, no reason appears for holding it unlawful, whatever its extent.

Supplementing the production and development of its various patented machines, methods introduced by the United Company for keeping them in efficient operating condition while in the hands of their various users throughout the country have most effectively aided the development of its business. It has undertaken, not only to train operatives in the proper use of the machines and to secure the prompt repair of any machine disabled in use, but also to supply each user from time to time with the latest improvements, either by adding them to the machines or by substituting improved for superseded machines, without extra cost to the user. This service it has furnished by maintaining at central points bodies of competent employés who attend to the above matters whenever and wherever they are notified by users that such attention is desired.

A system of standardization, introduced since 1899, whereby corresponding parts of the various machines have been so constructed as to be interchangeable whenever possible, has, in connection with the service furnished as above, effected a great reduction in the time lost by machines in waiting for repair. The introduction of such a system could not have been effected by the component companies, because each carried on the manufacture of its machines at a different place. While each of them rendered to its users some service of the character described, this was done to a limited extent only; and the maintenance of any such system of rendering it as the United Company has pursued would have been impossible to them, because of the heavy outlay involved.

The service secured to users of the machines by the system just described has been furnished to users without charge in addition to the royalties paid by them under the leases of their machines. For duplicate parts, extras, etc., required in operation, repair, or renewal, the terms of the leases required payment. Allegations in the petition that exorbitant prices were charged for such duplicate parts, etc., were not sustained by the evidence, and have not been insisted on in argument.

That the degree of success attained, and the preponderance in number of users supplied which the United Company has secured, are fully accounted for by the superior efficiency it has developed in its patented machines for work in combination with each other, together with the superior facilities it affords as above for their most efficient use, must be regarded as shown beyond question. It is not disputed that, when the petition was filed, its machines represented, in number and amount, the highest development ever reached in the art to which they belong, or that they are most in demand by manufacturers of the higher grades of shoes for that reason.

So little room for doubt does the evidence leave that the success and preponderance referred to are the natural and legitimate result of the intrinsic merit of the patented machinery and service furnished as to require clear and convincing proof of any assertion that they are due to causes other than these. It cannot be said that of themselves they justify any such presumption that unlawful means have been resorted to in attaining them, as has been held to exist when, in a business whereof no lawful monopoly is possible, because it is normally open to all, the success of one competitor has been attended by the disappearance of such competition as previously existed.

4. The petition charges the United Company with acquiring and absorbing the business of 60 different concerns or persons, described as "competitors," in pursuance of their alleged unlawful scheme, and as one method whereby what is called its "monopoly" has been built up. The nature and circumstances of these transactions are next to be considered.

As to one of these concerns (Boston Blacking Company), also made a defendant in the case, the charge was withdrawn early in the trial, and the petition dismissed by consent so far as it is concerned. (Record, p. 261 A.)

The petition has also been dismissed as against two other concerns, also made defendants (J. C. Rhodes & Co. and Thomas G. Plant Company), though the charge regarding the acquisition of their business is still urged against the remaining defendants. The transaction involving the concern last mentioned requires consideration by itself. The 58 remaining charges of unlawful acquisition may be more generally dealt with.

The 58 concerns or individuals referred to made transfers to or agreements with the United Company at one time or another during the years 1899 to 1910, inclusive; and the transactions related more or less immediately to shoe machinery in general, if the term be taken in its most inclusive sense. So far there is no dispute.

Eleven of the transactions were at various times in 1899; eight in 1900; six each in 1901 and 1902; three each in 1903, 1906, and 1908; nine in 1904; one each in 1905, 1906, and 1909; five in 1910. Though thus extended through a period of years, and though widely varying each from the others in character, both in respect to the nature of the transaction itself, and also regarding the circumstances attending it, the petition sets them forth as if all had been in pursuance of one and the same scheme, there described as a scheme to control shoe machinery in general, though now called a scheme only to control the particular classes of shoe machinery before mentioned.

The nature of some of these acquisitions may be regarded as enough of itself to prevent them from being called indications of a purpose to control any of the particular classes of machinery now important, however it might have been were the scheme now asserted the one originally alleged, for controlling all shoe machinery in general.

This seems clear in the cases where the business of concerns engaged in selling sand paper, or in making patent brushes, or in making peg wood, was taken over; and hardly less clear, without further evidence, in the cases where the business acquired was making wire and spare parts for use in an obsolete metallic fastening machine, or making treeing machines and parts thereof, or making needles, awls, and rawhide mallets, or making nails and tacks, or dealing in cement, blacking, and second-hand sewing machines, or making metallic heels and counters to go outside the shoe whereon they were used.

The business of four of the concerns acquired is described in the petition as that of making eyelets, enameled or not. Neither is alleged to have been making any eyeletting machine. The eyeletting machinery wherewith we are concerned, however, has been repeatedly described by the petitioner as machinery for inserting eyelets in uppers; i. e., such as the machine first leased by the United Company in 1902.

To the cases wherein inventions or machines for pasting outer leather to linings, or for cementing fabric to uppers, were acquired, little significance can be given, in view of the petitioner's abandonment of the claim of any scheme to monopolize machinery for producing uppers.

In several others of the transactions specified there was no acquisition of any tangible property whatever. These consisted of contracts only—either contracts for employment by the United Company, or contracts in which undertakings by it were accepted in substitution for obligations previously assumed by one of the component companies. In none of these cases is it made to appear that the party contracted with was a "competitor" in any kind of shoe machinery, or that the business of any such "competitor" was "absorbed."

There remain a number of instances involving the acquisition of patent rights, patents, or machines relating to or capable of being included within some of those kinds of shoe machinery whereto the case is restricted as above. In the larger portion of these the device or machine acquired is shown to have been of a kind not then being produced by the United Company. There being nothing unlawful, as above stated, in the acquisition of different groups of noncompeting

patented machines, it is clear that, by such enlargements of the United Company's field of operation, no "competitor" can be said to have been absorbed or driven out of business, and that no reason appears for holding the acquisitions thus made unlawful either in themselves or because made in furtherance of an unlawful purpose.

The instances then remaining in which the United Company was at the time producing or trying to develop for production a patented machine for doing work more or less similar to that for which the invention of the machine acquired was intended are the only ones capable of being regarded as of any possible significance for the purposes of the petitioner's case. In all such cases it appears that the acquisitions made were of patented improvements, whether or not embodied in an actual machine, enabling the United Company to increase the efficiency of its own machines, or to complete the development of others with which it was then experimenting, or had not yet succeeded in rendering commercially successful.

No case, however, is found among the acquisitions of the character last described wherein it has fairly been made to appear that actual competition existed between the device or machine acquired and any machine then being produced or experimented with by the United Company, of such consequence as justifies either the conclusion that the acquisition was for the purpose of suppressing such competition, or the conclusion that a material restraint of trade was thereby accomplished. In most of the cases of this sort the machine or device acquired was claimed to infringe patents belonging to the United Company, or the patent acquired was one which some machine belonging to it was claimed to infringe, or the application acquired was in interference with applications of its own, and the object of the acquisition is shown to have been the avoidance or compromise of pending or threatened litigation. In such cases it is still less possible to say that any wrongful absorption of a "competitor's" business has been proved.

The acquisitions above regarded as the only ones of any possible significance in the case were made at various separated times during the period of 11 years or thereabouts above referred to. It cannot be said that the later ones were in contemplation when the earlier acquisitions were made, bcause there is nothing to show that the circumstances attending any of them were such as could have been anticipated as likely to occur at the time of the preceding acquisitions. The most that can be said is that as, in the progress of events, the needs of the United Company became manifest and these opportunities presented themselves, they were availed of.

Taken together, the acquisitions of this class are, in importance and amount, only of a consequence relatively small in proportion to the entire field then lawfully belonging to the United Company. It does not appear that they contributed anything essentially important to that degree of commercial success obtained by the company as above. If they assisted in obtaining it, it was by assisting the development of the machines to whose ultimate efficiency it was due. It can hardly be said as to any of them that they afforded anything more than a basis whereon to build. Speaking of them generally, it may be said that the invention or machine obtained required further development in the

company's hands before it could be properly used. Thus in the case of the Goddu Company, the first instance of alleged unlawful acquisition specified (page 28), the metallic fastening machines acquired by purchase of a controlling interest in the company were none of them in the hands of users; their then state of development does not appear to have been such as made them capable of commercial use, whatever the merit of the inventive ideas they sought to embody; nor is the evidence sufficient for a belief that without reconstruction, radical in character, any one could have used them as competing machines. In not a few of the cases specified, the patent or machine, being wholly experimental when obtained, proved an ultimate failure so far as commercial success went, notwithstanding much time and money expended in the attempt to develop it.

It further appears that, during the same period of time, the cases wherein the business of a concern producing shoe machinery was offered to the United Company, and refused by it, were far more numerous than the cases of acquisition specified by the petitioner. As to several, at least, of these instances of refusal, the evidence warrants the belief that the business offered and refused much exceeded in importance to any such scheme of monopoly as now charged any of the specified acquisitions. The cases in which inventions were offered and refused during the same period were many times more numerous than the patents or inventions acquired. If a monopoly of all machinery for attaching bottoms to uppers was really undertaken, it is hard to believe that opportunities would have been neglected, as they were, such as those for acquiring the Union lock stitch machines, or the welters and stitchers of the R. H. Long Company, all of them patented machines for use on welt shoes, or for acquiring a considerable business in producing McKay sewing machines, though these were unpatented and not capable of use on shoes of that kind.

The petition charges generally that covenants in writing were taken from substantially all those whose business was acquired as specified: (1) Not to engage for long terms of years in competition with the defendants in commerce in shoe machinery; (2) to convey all inventions or patents in shoe machinery which they might make or acquire during such terms to the defendants.

These charges are not justified by the documents themselves, which have been produced. They are by no means uniform in their terms, there was no generally prescribed form for them, nor were they all the work of the same hands. Each was framed according to the circumstances of the particular transaction. In many cases, at least, the agreements required only that there should be no competition in the line of business involved in the particular transaction, or that all patents or inventions thereafter made in the particular line to which the acquired invention belonged should be transferred. There are enough of the agreements in these cases, which are without covenants of the kind described, to leave the allegation unjustified that such covenants were required in substantially all. And of the instances wherein covenants are found in any degree answering the alleged description, it may be said generally that none are clearly shown to have ex-

ceeded what the law permits. Still less reasonable would it be to regard what is found in them as indicating a consistent purpose on the defendants' part to exclude all those with whom the agreements were made from all possible future competition with the United Company.

An allegation in the petition that the business of many competitors was bought at exorbitant prices fails of support in the evidence relating to any specified instance of acquisition among those thus far considered. As to them, indeed, no claim of the kind seems to be seriously urged.

5. The acquisition in September, 1910, from Thomas G. Plant, consisting principally of a large number of patents, or applications therefor, relating to shoe machinery—machines embodying those inventions and Plant's controlling interest in the stock of the Thomas G. Plant Company, a shoe manufacturing concern—is the most important in amount of the acquisitions specified, and the one most relied on by the petitioner.

According to the petition, Plant was a competitor of the defendants, and they acquired his business in pursuance of their unlawful purpose.

The evidence does not show Plant to have been a competitor in the ordinary sense. He was not carrying on any going business in shoe machinery. He was neither producing his machines, nor supplying them to users upon any commercial scale, nor was he prepared so to supply them, though he had issued an illustrated catalogue of them. The petition alleges that he had been inventing and patenting his improvements for at least two years before 1910. In one factory only were machines embodying them being operated. This belonged to the Thomas G. Plant Company, whereof he owned a majority of the stock. He installed them there in May, 1910, displacing the United Company's machines previously used there in order to do so. Before he installed them there, he had offered to equip two other factories with them without requiring royalties for their use, but these offers had been declined.

There is uncontradicted evidence of declarations by Plant in 1909 that his intention was to equip these two other factories and his own with his new machines and then sell out to the United Company. That the effecting of such a sale, and not any actual competition in the market with machines then in use, was his real purpose, is hardly left doubtful by the history of his subsequent negotiations with the defendants. These, set on foot by him and at first stopped by the defendants' unqualified rejection of his proposals, he persisted in renewing, through various intermediaries, until they resulted in the purchase above described. It appears without contradiction that Plant was for a time under agreement to pay an influential shoe manufacturer, whose assistance he procured, $250,000 if he succeeded in bringing about the desired sale; also that he later offered, and ultimately had to pay, a commission of 5 per cent. on the price obtained to another intermediary, who undertook to put the transaction through for him.

The evidence regarding Plant's negotiations with the defendants sufficiently proves that they were never sought by the defendants, and

that there was never any attempt on their part to get Plant to sell them his inventions, or machines, or anything else, but that, on the contrary, all the efforts toward such a purchase were made by him. The first overtures toward it came from him; he began them soon after he had put his machines into the Plant factory; they led to interviews, all of which he sought, and at which his proposals were declined, without encouragement to renew them. Nowhere in the evidence is any indication found that, before Plant's overtures were thus made, any purchase whatever from him had been suggested to or considered by the defendants.

Whatever the merit of Plant's inventions, these machines in which he had first embodied them are not shown by the evidence to have been commercially successful in September, 1910, or to have been capable of such success in their then stage of development. They are shown to have been lightly built, not adapted to produce men's shoes, and by no means satisfactory in making women's shoes, the kind of work to which the Plant factory was devoted. The evidence is uncontradicted that, while operated there, they fell behind the United Company's machines, which they had supplanted, in efficiency; that breaking down and defective work was more frequent with them, and the cost per pair of making shoes with them distinctly greater. Though some of them, as later developed and improved by the United Company, proved to have merit, the most that can be fairly said of them in 1910, on the evidence, is that they were more or less promising experimental machines. There was no complete set of them for combined operation; for that purpose several important machines were yet to be developed. In the state in which the United Company took them over, they were not found capable of profitable use. Nothing is found in the evidence which affords reasonable support for the petitioner's contention that they were "right at the threshold of extensive competition with the United Company."

The petition alleges that a group of shoe manufacturers were in conference with Plant, in Boston, in September, 1910, "with a view to purchasing an interest in his inventions and machines, or to make some arrangement which would enable them to obtain machines for use in their factories and thereby be relieved from the domination and control of defendants." It further alleges that the defendants were "advised of the purpose and intent of said manufacturers," knew that if they succeeded in making arrangements with Plant there would be further removal of their own machines and competition thus created, and agreed with Plant upon the purchase made from him in order to prevent such competition.

But the evidence fails to support these allegations. It does not charge the defendants with any knowledge, at the time they came to terms with Plant, of any negotiations between him and the manufacturers referred to. No reference appears to have been made to them or their doings during the defendants' negotiations with Plant, and no reason is found to believe that apprehension lest he might conclude some arrangement with them induced in any degree the defendants' final agreement with him. Were it important, it might be added that, so far as the evidence can be said to show anything regarding

Plant's intentions toward them, it shows that he never really meant to enter into any arrangement with others if he could get the defendants to take off his hands everything which he desired to sell; and no purchase so extensive as this appears to have been at any time contemplated by the manufacturers mentioned in the petition.

The terms finally agreed on with Plant were so much more favorable to the United Company than any he offered when he first approached them, and so inconsistent with his previous attitude toward them, as to leave no reasonable ground for believing that the defendants had ever sought, expected, or planned for the transaction as carried out. And in what they were thus unexpectedly enabled to acquire from him there was included so much that was plainly of far greater consequence to them than could have been the avoidance of such competition as they can reasonably be supposed to have apprehended from his incomplete and undeveloped line of inventions—patents and machines also included—as to leave no sufficient ground for believing that avoidance of competition was their principal motive in accepting the opportunity offered. The normal, natural, and obvious business reasons, of wholly different kinds, why they should accept instead of refusing it, appear to have been so complete and sufficient as to render the conclusion unreasonable that it was accepted in order to escape competition.

Six million dollars, half in cash and half in United Company common stock at twice its par value of $25, was the price finally accepted by and paid to Plant for everything acquired from him. In the transaction no separate valuation was set by the parties upon the inventions, patents, and machines transferred, distinct from that of the controlling interest in the shoe manufacturing establishment. That part of the acquisition is, of course, beyond criticism so far as the Anti-Trust Act is concerned. That it was of great value is shown beyond question by the dividends then and afterwards paid on the stock acquired by the United Company. These, and the ultimate disposition of the stock itself, afford every reason to believe its actual value, when acquired, sufficiently great to reduce the actual cost of the patented improvements, also acquired, to a comparatively small proportion of the total payment made to Plant. Taking the transaction as a whole, if the total amount paid by the United Company was large, the total value of all that was received in exchange also appears, not as matter of opinion merely, but by actual results shown, quite sufficient to negative any claim that the defendants paid an exorbitant price for what they got.

The evidence that among these patented improvements obtained from Plant there were enough of sufficient value, in the defendants' hands and used as they only could have used them, in further developing and perfecting machines they were then producing or trying to produce, to make this part of the total acquisition extremely profitable to the United Company, was not met by any sufficient proof to the contrary. The agreement to take the patents and inventions was not made until after a careful examination and report as to their merits. The belief thereon founded that, used as above, they would be worth acquiring upon the terms proposed, is shown to have been justified

by the result; and the acquisition cannot be criticised so far as it was occasioned by that belief. As developed and added to its own machines by the United Company, some of the inventions acquired have proved to be of a value such as fairly justifies their claim that the patents acquired were the controlling feature of the purchase.

The evidence shows also, without serious contradiction, that one result of the bargain made with Plant was to relieve the United Company from an amount of litigation, then pending or in prospect, which would otherwise have burdened and hindered it to an extent far greater than it had ever had reason to apprehend from any litigation with which it had before been concerned.

A suit by it to restrain the Plant Company from breaking the leases of its machines, displaced in order to install the Plant machines as above, had been pending since May, 1910; and between Plant, or concerns wherewith he was identified, and the United Company, there were pending interferences, claims of infringement on both sides, and pending infringement suits, raising questions relating to his or its patents, so numerous, complicated, and important as to threaten interminable controversy.

It was part of the bargain with Plant, or followed from it as a result, that the above controversies were settled or avoided. That the prospect of accomplishing this result was a further normal, natural, and powerful inducement to the agreement made with him, cannot be reasonably doubted. In so far as the agreement was thus intended, no criticism of it can be valid.

The above reasons, none of them open to any charge of illegality, seem to me have been the really operative reasons which must have induced the defendants to enter into the Plant bargain upon the terms which he finally offered them. They appear so adequate, as legitimate business reasons for doing this, as in my opinion to leave no reasonable ground for holding, against the defendants' denial, that it was really a purchase to suppress competition. No such competition, or prospect of competition, at the time, is proved as would justify such a conclusion. The competition threatened by Plant, and his efforts to induce the defendants, in order to avoid it, to buy his machines and patents by themselves, were wholly ineffectual. They met with nothing but refusal on the defendants' part to consider his proposals. It was not until he offered, through the intermediary he last employed (Smith), the shoe manufacturing business of the Plant Company as well, that the defendants consented to deal with him.

While it may have been his plan to realize a profit by threatening competition, it was not until this proposition, based upon tangible property of substantial value, and of patent rights, was made, that any sale was effected. The property acquired being proved to have been worth the amount paid, the argument that the defendants were so anxious to hold a monopoly as to be willing to pay $6,000,000, or any other large sum, in order to get rid of a competitor, or that this was done in pursuance of a general plan conceived in 1899, fails completely.

6. In paragraph VI of the petition a variety of acts described as "unfair and monopolistic" or "oppressive" are charged to have been

committed by the defendants since the formation of the United Company by means of the predominance it has acquired. Of these, as set forth, "threats" of various kinds form a considerable proportion. It is charged that by "misrepresentations and threats" the defendants have induced competitors' customers to leave them, and have deterred others from attempting competition; also that they have threatened to use their financial or other power to secure to themselves the patronage of competitors. Under the above paragraph heading it is also charged that the defendants have bought up many patents for valuable inventions and held them long in disuse, that they have offered and granted rebates to such users of their machines as use them exclusively, and that they have bought out many competitors at exorbitant prices. There is a general charge of "many other unlawful acts too numerous to specify," and accordingly not specified, in the petition.

A long bill of particulars, containing alleged specifications of these charges, was filed upon the defendants' motion during the trial (June 25, 1913). But there are very many of the charges so specified in support of which no proof whatever has been offered. Of those to support which some evidence was introduced, comparatively few have been insisted on in argument. The charge that competitors have been bought out at "exorbitant prices" is found not established in the case of the Plant acquisition, as has just been stated. Nor is evidence found sufficient to establish it in the case of any one of the numerous minor acquisitions specified in the petition. It has not been insisted on in argument that this charge is proved as to any one of them.

Nor has there been any evidence sufficient to show a practice followed by the defendants of buying up patented inventions to hold in disuse. This charge also is one not insisted upon in argument.

The charge that rebates have been given to exclusive users of the United Company's machines rests upon (1) the vote of the executive committee January 29, 1900; (2) a circular letter addressed on the company's behalf to its lessees 10 years later, June 10, 1910. There is nothing sufficient to show that there was anything "unfair or monopolistic" about either the vote or the letter, or about anything done in pursuance of either.

The vote in 1900 was that royalties on the Gem insole machines be rebated to exclusive users of the company's machines. It appears that, having acquired the Gem Company, which had machines in use under lease at the time at a royalty of one-half cent per pair, the United Company added the machine to its Goodyear auxiliary set, and to users of such sets paid back the one-half cent per pair in order to leave the rate upon the entire auxiliary set the same as before it included the Gem machine.

As to the circular letter of June, 1910, it announces the company's intention of investing 15 per cent. of the royalties paid by lessees of the Goodyear welting, stitching, and turn sewing machines for three years, in the company's common stock, and of distributing this stock proportionately at the end of the term among those lessees who should have faithfully observed the covenants of their leases during that period.

Neither of these acts on the company's part can be said to answer to the terms in which the charge of offering and granting rebates is made. That either act was inspired by the purpose of giving exclusive users of the company's machines an unfair advantage over those who did not, or that either had that effect, cannot be said to have been proved, and the charge is not believed to require further notice. It would seem to have been suggested by those cases relating to railroads, wherein "rebate" has acquired an obnoxious signification.

It remains to consider how far the evidence proves the defendants to have used "threats and intimidations" of the various kinds described in the petition. As to far the greater part of the specified instances set forth in the bill of particulars, the charges of this kind have been allowed to go wholly without attempt at proof. Of those regarding which any such attempt was made, six only have been insisted upon in the petitioner's briefs or argument. No reason whatever to believe that any greater significance could be claimed for any others of the specified instances than for these appears from the evidence regarding them to be found in the record.

Mr. Winslow, president of the United Company, Mr. Barbour and Mr. Hurd, vice presidents, all of them directors, are the only defendants charged in these instances with using any threats or intimidations. The other persons charged with making them are Mr. Bayley and Mr. Willson (since deceased), managers for the company at various times, but never made parties to this suit.

The only "threats" which Barbour is charged with making are testified to by James N. Darrah, vice president in 1900 of the Standard Shoe Machinery Company. According to Darrah, Barbour, at a talk in New York in April of 1900, tried to get him to sell out stock in his company by telling him, in substance, that, if competitors of the United Company could not be bought out, they would be forced out. Barbour has denied that any such conversation took place. Darrah's evidence was not corroborated; and there is no proof that his concern, though it went out of business in 1901, was ever forced out or crushed by the defendants.

Mr. Winslow is charged, in testimony by Charles H. Morse, with having said to him at some time in 1901 or 1902, "You don't suppose we are going to allow you to put them on the market"—referring to certain pegging machines then being made by the Fifield Company, with which Morse was connected. Morse, on his own testimony, was then negotiating with Winslow about a sale of the Fifield Company business to the United Company, but they failed to agree as to price. Its business was sold in 1906, but not to the United Company. There is nothing to prove that the United Company ever interfered with the marketing of this machine.

Mr. Winslow is also charged, in testimony given by Charles S. Johnson, with having said to him during negotiations in 1902 or 1903, regarding a sale of the Tripp Giant leveler, in which he was interested, to the United Company:

"You had better sign that contract, because we are going to have your business any way."

But the negotiations did not result in a sale, and the Tripp Company's business, though sold out in 1905, was not acquired by the United Company. Not long after, according to Johnson's testimony, the United Company put on the market machines considered by him to be substantially the same as the Tripp Giant leveler, but there is no other indication of any interference with the Tripp Company or its business by the defendants.

Mr. Winslow is also charged, in testimony given by Merrick and Luitweiler, president and treasurer of the Union Lock Stitch Company, then developing machines not yet put on the market, with having told them in 1905, while attempting to persuade them to sell out to the defendants, that they would not be allowed to make any money, that the United Company would build their machines, that their business would come round to it and be taken by it, and that it was cheaper to kill competitors than to acquire them. The alleged statements are denied by Winslow. The business referred to is one never acquired by the defendants, nor is any interference whatever with this business shown. This was admitted, and the testimony of the two witnesses named is that they have put out 350 to 400 of the machines in question.

Bayley, a department manager for the United Company, is charged, in testimony given by Irving A. Hadley, then representing Kimball & Hadley, manufacturers of awls and needles, with having said to him in January, 1904, in answer to a claim by him that Kimball & Hadley could sell needles as cheap as the United Company, that the United Company could give them away if necessary.

It does not seem possible to attach any serious importance, for any purpose, to the remark, if made, even if anything said at the interview can be supposed to have had reference to a possible purchase by the defendants of the Kimball & Hadley business. Bayley was in a sanitarium, unable to testify, at the trial. Further testimony from Hadley, however, that certain factories had refused needles offered them by him for fear of controversy with the United Company, was contradicted by the managers he mentioned. The business of Kimball & Hadley was one of those acquired by the United Company, but it was not acquired until the following June. It consisted in making Goodyear needles, which, at the time of the acquisition, the United Company was not making at all. An attempt by Kimball & Hadley, in litigation with the United Company some time afterward, to prove that threats and intimidation had been used in acquiring their business, wholly failed. See United Co. v. Kimball, 193 Mass. 351, 79 N. E. 790.

Mr. Hurd is charged, in the testimony of Harry E. Cilley, with having said to him in 1901, during a conference with respect to a possible sale of his business to the United Company:

"You can't do any business except on our sufferance, and you can't get a new dollar for an old one."

It appears that Cilley's business at the time consisted in building a sole-leveling machine, that he was not satisfied with an amount suggested by Mr. Hurd as a proper price for it, told Mr. Hurd he con-

sidered it "outrageous," and never renewed the negotiations. Neither the business of this witness nor the remarks testified to, if made, can fairly be regarded as of any serious importance, in view of all the circumstances shown.

It thus seems clear that nothing proved as to the above instances of so-called "threats and intimidations" is sufficient to justify such allegations as are made in paragraph VI of the petition about them. Even if anything said by a representative of the United Company on these occasions can properly be called a "threat," in view of all the surrounding circumstances shown, there is certainly no adequate reason established for believing that any competitor's customers have been induced to abandon them, or that anybody has been prevented from attempting competition, by what was said. The instances relied on are widely separate in time and distinct as to circumstances and persons. They cannot reasonably be regarded as showing a concerted purpose to suppress competition through intimidation, such as paragraph VI purports to charge. In every instance the expressions said to have been used by a representative of the United Company were in interviews with persons interested in some concern or machine which the United Company was asked or might be asked to buy. As has appeared, propositions of this kind were constantly being made to its representatives, and many more of them were refused than were accepted.

Not in paragraph VI, but in the preceding paragraph V, of the petition, the charge is made that certain provisions of the leases, under which the United Company's machines have been operated by users, have been arbitrarily enforced, in pursuance of a general policy and practice to refuse machines for failure to comply with the terms and spirit of the leases, "and to otherwise injure" users so failing to comply.

In the above bill of particulars filed, as has been said, on June 25, 1913, "in amplification of section VI of the petition," the defendants are charged, in a number of specified instances, with threatening to remove or removing machines from the factories of users, because competing machines or machines obtained from other concerns were also being there used, or because such use of other machines was in contemplation. No proof whatever has been offered as to a considerable proportion of the instances thus specified.

In the instances specified regarding which there is some proof, nothing more is shown than that the United Company insisted, to a greater or less extent, upon observance by the lessee of provisions in his lease to which he had expressly agreed when he took the machine, and which he was purposely violating or proposing to violate to the detriment of the lessor, because such violation would tend to decrease the number of pairs of shoes operated on by the machine and thus the royalty to be paid for its use by the lessee.

If the provisions referred to in the leases are contrary to law, it was unlawful to insist upon them. The question here involved is later considered. But unless the provisions were unlawful, the evidence regarding these specified instances in which their observance was insisted upon wholly fails to show that in any instance the defendants did

or attempted anything whereof either the lessee of the machine or any one else had any right to complain.

It may be said generally that the instances in which machines were in fact removed from the factories of lessees under the provisions referred to have been so few in proportion to the total number of leases as to leave the general charge that such provisions have been arbitrarily or oppressively enforced destitute of any sufficient foundation. Only five such cases appear in the evidence. In each, the lessee's conduct was in willful disregard of the lease agreements, and afforded a complete justification for the lessor's action, unless none is possible.

The bill of particulars filed June 25, 1913, brought into the case for the first time allegations that the defendants have endeavored to organize strikes in factories of shoe manufacturers wherein shoe machinery competing with their own was operated.

The only specifications under this charge are, in substance, that in June, 1910, Willson, then general manager of the United Company, assured certain employés of the Thomas G. Plant Company that, if they would organize a strike in that factory, the United Company would pay all expenses and reward the leaders "handsomely"; that, in reliance upon said assurance, about 300 of the operatives were brought into such an organization and a large sum of money expended by the organizers; that Plant thereupon had the organizers watched, and no strike resulted.

The only evidence to show that Willson ever gave any such directions or assurances came from three witnesses, employés at the Plant factory in June and July, 1910, who gave their testimony in person before the court. No one else was present, according to their statements, at the various interviews they described between Willson and themselves during the two months just referred to. Willson having died in 1911, and before these charges were made, no direct contradiction was possible of their statements as to what was said by him to them.

He told them, according to their testimony, that if they would organize a strike at the factory, and give him all the information they could about the Plant machines, he would pay their expenses, get them jobs, and pay them also $2,000 in cash, according to two of them—$1,000, according to the other.

Willson never did pay them any money, as they all agreed. But their testimony was that they got about 300 men into an organization and spent about $1,500 of their own money in doing so, mainly in entertaining the men who joined. According to their further statements, $600 was contributed by one of them, $500 by another, and $400 by a third; their wages at the time were $15 per week; these sums were the savings of 11 or 12 years; accounts, lists, and vouchers, containing details of their doings and expenditures, were kept; but all of these were either surrendered to Willson or destroyed by them. No written evidence of any kind was offered in support of their story.

It appeared that there was some prospect of trouble between Plant and the employés at the factory at the beginning of June, 1910, but, after meeting a committee with regard to an increase of pay asked for, Plant granted it and no strike or other trouble ever occurred.

There was no proof whatever that he ever employed detectives to watch the three witnesses in question, or that any attempt by them at organizing a strike ever came to his knowledge.

The testimony of these three men was not corroborated by any others of the then employés at the factory. On the contrary, several of them, shown to have had ample opportunity for knowing the facts, had there been any such organization attempted as testified to, denied any knowledge of such organization or of any such preparation for a strike.

Winslow, president of the United Company, testified that Willson had told him, in June, 1910, that three Armenians had been to him asking that he furnish them with money to start a strike in the Plant factory, and that his instructions to Willson thereupon were to have nothing to do with them. No money of the United Company was ever paid out for any such purpose.

Not only does the evidence of these three witnesses appear unworthy of belief in view of its improbability, its lack of corroboration, and the evidence tending to discredit it, but it is difficult to understand how the petitioner could seriously have expected the court to accept such testimony, or have considered itself justified in offering it.

The history of the proceedings in this case indicates that efforts which may fairly be described as extraordinary have been made to bring before the court, so far as possible, all sayings or doings of any of the numerous defendants or their representatives, during the period beginning with 1899 and ending with 1911, which might afford ground for charging them with oppressive, coercive, or like unfair conduct toward competitors of the United Company or the public. In view of the long period and wide fields thus searched, the numerous abandoned attempts to prove something of the kind above indicated, and the insignificant result of the evidence actually offered and finally relied on, the conclusion seems fully justified that the policy and methods pursued by the defendants and by the United Company have been, in general, above reproach in any of these respects.

7. It remains to consider the charges made in the petition as to certain provisions in the leases and license agreements, under which the United Company permits the use of its patented machines, that they are either unlawful in themselves, or have been devised, adopted and used by the defendants for the purpose of destroying competition. (Paragraph V.) Upon these charges the petitioner may be said to have finally put its main reliance.

With regard to the provisions in question, as with regard to many of the matters heretofore considered, the position finally taken by the petitioner has differed widely from that originally taken in the petition as filed.

None of the constituent companies were, in 1899, selling outright the patented machines they manufactured. The bill alleges the contrary, and charges that one of the steps taken after 1899, in pursuance of the alleged scheme to restrain or monopolize, was to discontinue sales and compel leases. An attempt to support this charge by evidence wholly failed. Nothing of the kind was done, nor is it

easy to see what grounds for making the charge could ever have been supposed to exist.

It appeared, on the contrary, that the method of marketing their patented machines followed by the constituent companies in and before 1899 was exclusively that of leasing, for a royalty upon each pair of shoes whereon the lessee should use the machine. Some of the leases also required an initial payment; others did not. The evidence also shows that the general system of leasing in this manner was and had long been the usual and accepted method of dealing between the makers of patented shoe machinery and those desiring to use their machines, and that, in its main features, it had thus become so widely and firmly established as to render the substitution of a different system practically impossible.

The defendants continued the policy which they found in use by the constituent companies, as to the kinds of machines to which this case now relates. Its machines of these kinds have never been sold outright; all users have taken them from the United Company upon leases granting the right to use the patented improvements embodied in them during the term of the lease.

It should be stated here, however, that as its business has progressed, the United Company has developed a very large number of machines of other kinds useful in shoe manufacturing, as to which the policy of leasing only has not been followed. Such machines, included in what is known as the company's "General Department," have been and are sold outright to anybody willing to buy them, without restriction of any kind—a course of business more liberal than that pursued by either component company. The number of different machines wherein the United Company deals in the manner stated has come to be very considerable.

There was finally no contention that any law has been violated merely by the company's continuance of the policy of leasing only, instead of selling.

That there was any violation of law in continuing, as the United Company did for a time after 1899, to maintain the leasing system and use the forms of leases which they found in use by the constituent companies, the petitioner is not in a position to contend.

There were suggestions in argument on its behalf that the system referred to was unlawful in some of its features, but the petition contains no such allegations. The claims therein made relate wholly to the leases put into use by the United Company after 1899, and rest on the proposition that these contain provisions "not found in [the] former lease and license agreements"; the new provisions complained of being immediately thereafter specifically described. The petition characterizes them as "arbitrary, oppressive, and unreasonable." (Paragraph V.)

The United Company, of course, became, after its formation, the sole lessor of all the patented machines formerly leased by the different component companies. During the 12 years which then followed before this petition was filed there were, as is not denied, changes from time to time in the lease forms used for leases under which the use of certain of its machines were permitted. Generally speak-

ing, one form was used with all leases of the same machine. There were some machines which might be taken under either of two alternative forms.

According to other allegations in the petition, it was part of the defendants' unlawful project, at the time of their combination in 1899, to refuse to sell or lease any essential machine, except on condition that the lessee buy or lease of them practically all other machinery necessary or useful to him as a manufacturer of shoes. No proof was offered at any stage of the case that the defendants had in mind, in 1899, the system of leases they later developed, or any of the modifications therein involved of the system which they found established in 1899.

At the argument the admission was made, on behalf of the United States, that there was no proof that, at the time they formed the United Company, the defendants "had in mind the adoption of the system of leasing which they later developed." And the position then taken by the petitioner in argument was that the leasing system referred to has resulted in illegal restraint or monopoly, and that the intent which prompted its development is therefore "absolutely immaterial."

As to the allegation that the defendants contemplated a policy of refusal to lease, except on condition that the lessee buy or lease of them "practically all other machinery of whatever kind necessary or useful" to him as a manufacturer of shoes, it requires no further notice, now that the charge of restraint or monopoly in "any and all kinds of shoe machinery" has been abandoned. The evidence abundantly shows that nothing of this kind was ever contemplated, attempted, or done, and that there was never any justification for the charge as made.

With regard to the modifications introduced by the defendants upon the leases in use by the constituent companies in 1899, the petition alleges in substance: (1) That under the former system lessees from one company were not held to the exclusive use of machines manufactured by any of the others. (2) That since 1899 the defendants have required their lessees, by provisions not found in the leases previously used, "to agree to use exclusively one or more of the classes of machines included in said group of machines owned and controlled by them, upon penalty of having all the machines included in said group, so leased to them by defendants, immediately reclaimed and taken away and the lease and license agreement cancelled." (3) That lessees are now obliged to hire each machine for a period of not less than 17 years. (4) That lessees are now compelled to obtain all duplicate or repair parts, extras, etc., from the defendants at exorbitant prices; (5) also to pay return charges at the expiration of the lease, sometimes amounting to the original cost of building. (6) That the defendants now reserve to themselves in each lease the right to terminate all existing leases between themselves and the lessee upon his failure to use exclusively and to full capacity any machine leased to him by defendants. (Paragraph V.)

The evidence failed to show that lessees from the United Company had ever been compelled to pay exorbitant charges for repair parts,

etc., or to pay any unreasonable return charges on leased machines. (4) and (5) of the above alleged modifications may therefore be now disregarded. In the subsequent sections of the petition no further reference to them is found.

In the "conclusion" section of the petition, the following only, among the provisions thus alleged to have been added to the leases by the defendants after 1899, are charged to have been unlawful: Agreements by the lessee (1) that he would use exclusively machines of the lessor to perform the same kind of work as that performed by the machines leased; (2) that he would use in work other than that for which the leased machine was designed only machines of the lessor; (3) that, if the lessee should violate either of said agreements, he would forfeit the use not only of the leased machine, but others, whether accomplishing the same or different work; (4) that he should use the machine leased for seventeen years.

The objections made by the petitioner, at the argument, to agreements contained in the United Company's leases were not confined to those specified in the petition as above, but included others nowhere therein referred to.

At the argument, certain clauses extracted from the leases shown to have been used by the United Company were said to embody the agreements objected to as unlawful.

By what was referred to as the "full capacity" clause, lessees agreed to use the machine to its full capacity on all shoes, etc., made by them in the manufacture whereof such machinery was capable of use.

By what was referred to as the "additional machinery" clause, lessees agreed that for any more work than their then leased machines could do, of the kind which machines belonging to the same department could perform, they would lease enough others to perform it from the lessor.

To neither of these two clauses was any reference made in the petition itself, as appears from the above summary of provisions in the leases therein complained of. The other clauses referred to at the argument were the following:

By what was referred to as the "exclusive use" clause, lessees agreed that, if they should cease to use exclusively machines leased from the United Company for doing work of the same kind upon shoes, etc., made by them, the lessor might, at its option, terminate all their leases of its machinery for doing work of that kind.

By what was referred to as the "prohibitive" or "tying" clause, lessees agreed that the leased machine should not be used upon shoes, etc., whereon certain other specified operations had been performed by machines not leased from the United Company.

By what was referred to as the "right to terminate all leases" clause, lessees agreed that failure on their part to observe any condition, either of the lease of the particular machine, or of any other lease from the United Company then in force, should give the lessor the right to terminate all leases of its machinery then held by them.

The above three clauses, and the alleged agreements requiring lessees to use the leased machine for 17 years, appear to be the only

provisions among those commented on in argument to which objection was made in the petition itself.

As to the use of such agreements as are expressed in the "full capacity" clause or the "additional machinery" clause, whereof, as has been stated, no complaint is found in the petition, the evidence shows that they were not new introductions by the United Company, but were contained in certain of the leases used by the component companies before 1899.

By neither was any agreement made which the evidence has shown to have been abnormal or unusual, or to have exceeded what was reasonably necessary to protect the lessor's interests in the contemplated use of its machine.

The lessor might well accept for the use of its machine a smaller royalty per pair, based upon the understanding that the machine would turn out as many pairs as its capacity permitted, than it could afford to accept without any such assurance.

Similar considerations apply to the "additional machinery" clause. Without it, the lessee would be at liberty to do his slowest and most difficult work on the leased machine and the easiest on others or by hand.

The petitioner, indeed, conceded that both the above clauses might be unobjectionable had they not been used together with the others; but it relied upon their use with the others as tending to show the existence of an unlawful scheme. That this is an afterthought only is shown by the failure to set forth either clause, in that aspect, in the petition. Moreover, as to the "additional machinery" clause, the defendant had discontinued its use altogether two years before the petition was filed, a fact inconsistent with any claim either that it assisted monopoly or was intending to do so.

The consideration of the remaining clauses raises, in the first place, the question as to the truth of the allegations in the petition that such provisions were not found in the leases used before the consolidation of 1899, but were modifications thereafter introduced by the defendants, in pursuance of their alleged intent to monopolize the business.

The following facts appear regarding the leases in use by the component companies before 1899:

In the case of the more important machines an initial payment, of greater or less amount, was required of the lessee in addition to the royalty per pair stipulated in the lease. Such initial payments were required by all the leases from the Goodyear Company. The Consolidated & McKay Lasting Company required such an initial payment in leases of two out of the five patented lasting machines wherein it dealt; in its leases of two others no initial payment was required; and its remaining machine was leased either with or without initial payment at the lessee's option, the royalty being higher in the latter case than in the former. The McKay Company was the only one of the component companies whose leases did not require initial payments, whether those of the patented heeling or metallic fastening machines, which it made, or those of the Davey pegging machines, which it controlled.

It may be further stated, with regard to the leases made by the constituent companies, that two or more machines of the same company, intended for use in substantially the same operation, were generally leased as a group. Thus Goodyear Company leases required its welter and out-sole stitcher to be used together, and permitted the auxiliary machines intended for use therewith to be used only on shoes welted and stitched thereon. As to its Ideal laster, the use thereof on welt shoes was restricted to use with its welter·and stitcher. The leases of this company did not provide that the lessee should use its machines exclusively, and that unless so used the lease should terminate; but there were such provisions in the leases of the other companies. The Lasting Company's leases required use to the ·full capacity and the taking of additional machines for any additional work.

All the above leases were for terms for the most part either indefinite, or until cancellation by the lessor, or for the life of the patents embodied in the machines, or for 17 years and thereafter during the life of any patent embodied.

In the forms of leases or license agreements which they found in use as above, the defendants made no change whatever until about a year had elapsed since the formation of the United Company. This the evidence shows without contradiction, and it further shows that, when there were substitutions of new forms of leases in place of any of those in use as above, there was no change made all at once or in pursuance of any general plan, still less of any arbitrary plan, but, on the contrary, the change in each case was because special circumstances affecting the particular group of machines had come to render such change desirable.

The history of the successive changes adopted, and of the reasons for each, was fully brought out in the evidence. Beginning with the first new lease form, adopted in March, 1900, the adoption of oth-. ers followed at various times during the subsequent years. Some of the provisions most objected to by the petitioner were not adopted until 1904 or 1905.

Regarding the various modifications so introduced, it may be said in general that they tended to relax previous restrictions upon the use of leased machines, and to reduce the cost to the lessee of installing them. The most important changes made were, in substance, as below:

For agreements whereby the lessee expressly promised exclusive use of the lessor's machines belonging to the same group with that leased, there were substituted options to cancel, reserved to the lessor, in case the lessee should discontinue such exclusive use.

The requirements found in leases used by some of the component companies that the leased machine should be used to its full capacity were extended to apply, in general, to all such machines, of the classes involved in this case, as were used in factories to measure· the amount of work done, and thereby fix the amount of royalties to be paid upon the machines used in doing it.

As to certain groups of machines, provisions were introduced restricting the lessee's use of all machines belonging to the group to use only on shoes operated on by one or more of the other groups of

United Company machinery. But in all such cases, without substantial exception, there was also offered an alternative lease form not containing such restrictions. An initial payment was required from all lessees preferring the latter form; no such initial payment was required from lessees under the form first mentioned.

A uniform term of 17 years was adopted for all the leases

Considering the clauses objected to in the light of what preceded them, and of the circumstances attending their adoption by the defendants, the petitioner has not, in my opinion, proved that the defendants' object in adopting them was the prevention of competition by others. Such prevention might indeed follow from the more favorable terms offered lessees, but modifications made in the existing system for the direct purpose of otherwise better adapting it to exclude competitors, would have been different in character from the modifications represented by these clauses.

Not only would it have been unreasonable, as has been said, to expect the defendants to substitute a wholly different system from the leasing system which they found in use, but the evidence affords no reason to believe that anything of the kind was desired by manufacturers in general. The advantages to them of not having to tie up capital in patented machines, and of paying for the privilege of their use only according to the amount of use, were advantages which they cannot be supposed desirous of surrendering.

Modifications in the contracts offered them tending, as these are shown to have done, to enable the company, through provisions adapted to increase the number of shoes worked on by each machine, to lessen the royalty charged per pair, and to diminish or dispense with the initial payment before required, were so obviously prompted by the purpose of developing the company's business through the perfectly legitimate method of offering them on terms more advantageous to users, that it would be unjust to treat them, on evidence no stronger than that here presented, as really intended to accomplish an arbitrary exclusion of users from any dealings with others.

If it were made to appear that the leases containing these clauses accomplished in and of themselves an unlawful restraint of trade, or necessarily secured to the defendants an unlawful monopoly, the intent to accomplish these results would, of course, be imputed to the defendants without regard to their actual purpose in adopting and using them. But the evidence seems to me insufficient for the conclusion that such results are so accomplished. The contention that they are fails, in my opinion, to take into account the defendants' rights in the field lawfully secured to them in the various patented improvements they had lawfully controlled and combined, and fails also to concede them proper scope for the rights properly incidental to their control of said improvements, to make such agreements with their lessees as would best promote the efficiency in combined operation of the machines leased, and thereby best enhance and safeguard their just return therefrom in the form of royalties.

The complaints made regarding leases embodying the clauses referred to are not directed against those pertaining to any particular

kind or kinds of machines, as more objectionable than others. It is their entire combined effect which is attacked.

Concurring as I do in the. views expressed regarding them by Judge BROWN, I am obliged to regard the petitioners' allegations of their illegality as not sustained by the evidence.

In my opinion, the bill should be dismissed.

BROWN, District Judge. The United States charges that certain provisions in the lease and license agreements of the United Shoe Machinery Company with shoe manufacturers restrain interstate commerce and tend to create or perpetuate a monopoly of interstate commerce in shoe machinery.

We may examine this topic, which comprehends a large number of very long and elaborate documents and a very large portion of the briefs and arguments on each side, most conveniently by considering the effects which the United States claims result from such provisions, rather than by attempting to set forth in full the provisions themselves.

Complaint is made of the effect of such provisions:

I—Upon the shoe manufacturers.

II—Upon other manufacturers of shoe machinery.

The rights of these two classes and the effect of the leases upon each present quite distinct questions. The only competitors, or possible competitors, are other manufacturers of shoe machinery. The shoe manufacturers, as such, are not competitors. As the complaints of the United States on behalf of the shoe manufacturers and on behalf of other machinery manufacturers relate to distinct matters, they should not be taken cumulatively, and should not be confused.

### The Effect of the Leases upon the Shoe Manufacturers.

This may be considered in three aspects:

As bearing upon the question of the legality of the original combination or organization of the United Shoe Machinery Company.

As an alleged illegal and oppressive outgrowth of power obtained by combination.

As restricting the shoe manufacturer's freedom of choice in taking the machines of other manufacturers, as preventing him from using the machines of others, and as compelling him to use the machinery of the defendants.

The petition of the United States charges that the defendants—

"conceived the idea of acquiring the ownership or control of all concerns engaged in manufacturing and dealing in any and all kinds of shoe machinery, and then to refuse to sell or lease any of the essential machines to the manufacturer of shoes except on condition that he buy or lease of them practically all other machinery of whatever kind necessary or useful to such manufacturer of shoes, and thereby to exclude all competition by other manufacturers of such shoe machinery and to monopolize the trade and commerce therein among the states and with foreign countries."

It is also alleged that certain lease and license agreements constitute steps in carrying out such project.

It is urged in effect that such plan comprehends a denial to shoe manufacturers of such opportunities to obtain machinery as existed

before the consolidation, and a compulsion upon them, if they desire a special kind of machinery, to take also other machines of different kinds from the defendants.

There seems to be in the case no other basis for such allegations than the leases themselves.

This bill was filed December 12, 1911, before the decision in United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed. 481. In that case the argument of the United States as to the so-called "tying clause lease" shows a conception of the character and effect of the leases similar to that set forth in the bill of complaint in the present case. It was supposed that the effect of such leases was to compel customers to take all of their machines from the defendants, or all from other sources, and that this was a direct restraint upon competition and trade by depriving them of the existing right to use some machines without also using others.

The argument as to the effect of the leases both in United States v. Winslow and in the present case seems to be based rather upon an ingenious theory of bringing the defendants within the Sherman Act than upon any proper interpretation of the leases or accurate information as to the facts.

The union of noncompeting businesses in a single company would appear to have no tendency in itself to suppress competition. The union in a single company of distinct companies dealing in distinct patented inventions for performing different operations would seem remote from the sphere of the Sherman Act. To charge defendants, who were engaged in the manufacture and sale of patented machinery, with an attempt to monopolize, had little plausibility in the face of the fact that grants of monopoly had been made by the United States.

The alleged plan of a refusal of what before could be had separately, as a means of compelling the taking of other machines, was a principal ground for invoking the Sherman Act.

The leases in evidence, as documents, fail to substantiate the charges either as to the contrivance of such a plan, or as to its execution. It appears that after the consolidation there was no refusal, or imposition of conditions as alleged, but that the defendants continued to give manufacturers terms which were substantially the same as before, and in some instances better than those offered by the constituent companies before the consolidation. This is shown not only by the exhibits of "independent" leases, but by the testimony of officers of the company.

The charge seems to have been based upon certain so-called "tying clauses." There has been some confusion as to the scope of the term "tying clauses." The United States gives the following definition:

"'Tied to' means that machinery cannot be used in the manufacture of boots and shoes with machinery other than that owned and controlled by defendants."

This seems to require consideration of clauses of two kinds:

(a) The "exclusive use" clause.
(b) The "prohibitive" clause.

The "exclusive use" clause reserves to the lessor a right to cancel the lease in case the lessee shall fail or cease to use exclusively ma-

chinery of the kind leased. This kind of tying has no direct bearing upon the question of the legality of the combination. What was before separate is separate after the consolidation.

The "prohibitive" clause provides that the leased machinery shall not be used in the manufacture of shoes that have been, or are to be, operated upon by machines of certain specific kinds, not leased from the lessor. Though a similar clause was in use before the consolidation, it related only to machines of the kind made by one of the constituent companies. After the consolidation it related also to machines of other kinds formerly made by other of the constituent companies.

The prohibitive clause, therefore, is the one that has relation to the supposed scheme of using the power acquired by combination to refuse machines that before were separately obtainable, and to offer such machines only on condition that other machines of different kinds should also be taken.

"Tying," therefore, does not mean that the manufacturer is required to agree, or agrees, not to use the machines of others, but merely that he has secured only limited rights of use, and that if he exceeds such limited rights he may lose his lease. It is not a question of the legal effect of the lease, but of the practical consequences of securing only restricted rights of use. The term is misleading in its implication that the manufacturer is bound by contract not to use the machines of others. He is bound only not to use the leased machinery in violation of the terms of the lease. "Tying" is an inexact and equivocal term, which may refer merely to the machine, or may mean either that the lessee is bound by contract or merely is under strong practical inducement.

The restricted or prohibitive leases do not in themselves as documents prove the denial of the right to procure, as before, independent leases for individual machines. As matter of fact, independent leases which did give the right to use the machines with machines of other kinds, made by other machinery manufacturers, were always procurable. This was the general rule, and if there were any exceptions they were, so far as appears, inconsiderable.

It is a result of the consolidation that the United Company offers more attractive contracts for a group of machines of different kinds than for machines of one kind only; but as it still offers the contract for machines of one kind on as good terms as before it is difficult to see how that is detrimental to the shoe manufacturers.

The charge of this supposed scheme to deprive former customers of the right to use some machines unless they would also use others seems to have originated either in the erroneous assumption that a prohibitive lease was the only kind procurable, and that the former customer had no choice, or in disregard of the fact that it was merely an alternative form of lease. As the leases prove no such plan, whether of the extent alleged or of less extent, and as the evidence proves the exact contrary of what is charged, we think that the United Shoe Machinery Company is, upon the merits, entitled to a full clearance from this charge.

It was, however, urged upon final argument, despite the decision in United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed.

481, that because the union of distinct lines in a single hand put it within the power of the company to devise and carry out such a scheme, the combination had such potentiality of evil that it should be disintegrated. This argument extends beyond reasonable limits the import of certain expressions of the Supreme Court in cases where there was such combination of competitors as to eliminate competition. This was within the statute, though none of the evils resulting from destruction of competition might yet have ensued.

In this case the mere consolidation of noncompetitive businesses did not suppress competition, nor deprive customers of rights previously given by the constituent companies, and has no necessary or probable tendency to develop such a scheme as is unjustly attributed to the defendants. There must be added to the combination, from which naturally no such results would flow, an entirely new scheme.

The defendants having completely answered the charge that they devised or carried out such a scheme, the rejoinder that they might have devised and carried it out if they saw fit is entirely too far-fetched to bring the defendants either within the terms or within the spirit of the Sherman Act. Not only is there a failure of proof of the existence of such a scheme or of such a practice, but there is strong evidence to the contrary; not only in express denial, but in the undisputed fact that the defendants' Goodyear welter and stitcher have never been put out on leases that prevented their use with machines of other kinds obtained from other manufacturers. These are the most important of the defendant's machines and the center of its system; they are the principal royalty paying machines, and are furnished with a recording appliance to determine the number of shoes operated upon. The denial of their unrestricted use would have best served the alleged purpose of forcing the use of other kinds of machinery. The fact is that after the consolidation, as before, these machines, which the complainant's expert testifies are the only essential machines, and which are essential only if a shoe manufacturer chooses to make the special kind of shoes for which they are specially adapted, rather than shoes of other kinds, were put out only upon leases which did not contain the prohibitive clause.

The validity of the combination, therefore, is in no wise affected by the subsequent use of the prohibitive clauses.

We may next consider whether the shoe manufacturer who has chosen to take a lease permitting only a restricted or limited use of a particular machine is in any way injuriously or improperly affected by the fact that the businesses which before were in separate hands are now in a single hand.

It cannot be denied, and is practically conceded by the United States, that the "prohibitive clause," which is said to have the practical effect of tying together machines of different departments, is a limitation of the use of patented machines. The licensee has no right beyond the express provisions of his license, but is not bound by contract to take a machine for the performance of any other operation. If he desires to use for certain other operations the machinery of other manufacturers, he is met by the fact that the lease he has chosen, because it has

been offered upon better terms than an unrestricted lease, gives him no right to continue the use of the leased machine. This, of course, may constitute a strong practical inducement to take other machines for other operations from the defendants, rather than from other manufacturers. This inducement will be as strong as his desire to retain his lease. This, then, becomes not a legal, but a business, proposition.

The shoe manufacturer may untie the leased machine by taking another form of lease which contains no restriction, but requires an initial payment—though the royalties are the same. The amount of the "initial payment," which is a defined sum of money, seems, therefore, to constitute both the inducement to choose the restricted lease and the deterrent from changing a lease once taken for an independent lease.

This reduces the matter to one of dollars and cents. The defendants charge more for a machine used with machines of other manufacturers than for machines used as a part of a defined group of defendants' machines. Had they not combined the different companies they would have no occasion to do so.

The attack of the United States upon the "tying clause" makes no distinction between new machines which originated with the defendants and those in existence before the consolidation. There is, moreover, no attempt to show that the cost of independent machines has in any respect been increased since the consolidation, and the evidence from the defendants is to the contrary. Nor has the United States made any attempt to show by evidence that the prices charged for independent or unrestricted leases are excessive, or such as to prevent the manufacturer from using them profitably. The necessity of meeting the defendants' showing that there is no substantial obstacle in the way of a manufacturer who may desire to equip different departments with machines taken both from the United Shoe Machinery Company and from other manufacturers is recognized by the United States, and the brief states:

"The amount of the initial charge for installing machinery under the so-called independent lease, and the cost for changing from one form of lease to another, is so excessive as to restrain the manufacturers from choosing the independent system and to coerce them into taking the restricted forms."

Under this heading the United States relies merely upon the difference in price between the independent lease and the restricted lease. This is fallacious and does not meet the point. If the prices for independent leases are reasonable prices, if the shoe manufacturer can obtain what he could before, and upon reasonable terms, the fact that he and others are offered better prices for prohibitive leases is, of course, immaterial.

It is very earnestly contended that by this clause a shoe manufacturer is "bound hand and foot," and "is obligated" to take other machinery from the defendants. But when we consider that he has voluntarily chosen the limited right to use, and has merely declined to pay the price for the unlimited right to use, that he has got all he was willing to pay for, it seems fair to say that the only restraint upon him is the fact that he cannot make use of another's property without his consent, and that this consent will cost him money.

It might well be said upon the authority of Henry v. Dick Co., 224 U. S. 1, 35, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, that the patentee's right embraces the lesser right of permitting others to use upon such terms as the patentee chooses to prescribe, and that the reasonableness of the terms offered for unrestricted use is not open to inquiry. But surely, if the argument is made that there is coercion through an excessive price, such an argument can have no weight whatever for any purpose legal or ethical unless the fact that it is excessive affirmatively appears. From such evidence as is presented in this case as to the amount of initial charges upon independent leases we can draw no support for the charge of coercion through excessive charges.

The United States contends that the fact that independent leases are also offered is immaterial, and that the validity of the prohibitive lease must be determined upon its terms alone. But this contention is clearly wrong. The tying of which complaint is made is merely the practical effect of the shoe manufacturer's choice of a restricted rather than an independent lease. When he wishes to provide himself with machines for other departments, his choice of the machines of other manufacturers may result in displacing machines leased from the defendants. If, however, he may still obtain the defendants' machines by the payment of an initial charge, then the only restraint upon his free choice is the sum of money required to retain such of the defendants' machines as he has already installed. When a factory is equipped in the first instance with defendants' machines adequate in number for all departments, the choice between independent and restricted leases is a question merely of the comparative cost of installation. After a special equipment is outgrown, and there arises a demand for other individual machines to supplement it, then the manufacturer may desire a partial equipment with other machines of other manufacturers. Here arises from the prohibitive clause the substantial obstacle above referred to: That the installation and use of such machines may result in the removal of the whole equipment which he has taken from the defendants.

But the situation is one that can result only from a direct violation of one or more of his leases. While this may seem a harsh consequence of a breach of contract or of an infringement of the defendants' patent rights, it cannot be said to touch the question of the validity of the prohibitive clauses. Even should we regard the agreed consequences of a breach of contract as serious, this does not relieve us from deciding the question whether the contract in itself is valid.

As it is not the purpose of the defendants to take their machines out of factories, but rather to put them in, we must consider those clauses which are designed to induce their installation, rather than those clauses that are designed to prevent a breach of contract, or which reserve a right to terminate the leases upon an infringement of patent rights.

We may assume that the prohibitive leases with the reduced prices are adopted by the defendants as an inducement to the manufacturer to take also several different kinds of machines, and that, having once taken a restricted lease, the manufacturer remains under a strong in-

ducement to take machines of other departments from the defendants, and not from other shoe machinery manufacturers.

The United States contends that the patent laws confer upon the owner of a group of machines, each protected by a distinct patent, no right to handle the entire group as a unit, thus making one patented machine aid another.

It is true that the right granted to the patentee to exclude others from the use of his patented invention is confined to the subject-matter of that invention. It does not include the right to exclude the use of any other machine, patented or unpatented. When, however, a patentee has installed in a factory several distinct machines, each upon a restricted lease, he has as to each a full right of exclusion from other than the licensed use, and thus may legally exclude all machines that compose the group. But the proposition that patented machines cannot be handled as a group is stated too broadly. If what was before in separate hands is grouped in a single hand, and handled only as a unit, this might result in a refusal of what before was obtainable. But if the patented machines are handled both as individual machines and as a group, so that there is a free choice between the taking of individual machines and a group, we see no ground for objection.

One patented machine may be made to aid another in two ways: By using a refusal to deal with them separately as a means of compelling the taking of both; or by offering both at a lower price than the sum of the separate prices for each. The first is the way charged in the petition, but disproved as matter of fact; the second is the common device of wholesaling instead of retailing.

Were the defendants exercising merely the ordinary rights of owners of property, it could not be said that an entire contract concerning a group of such machines was illegal.

It is conceivable, if a single person should assemble in his hands a large number of distinct patented articles previously upon the market, and refuse to sell any unless all were taken, that this in special circumstances might constitute such obstruction to a former freedom of trade as to fall within the Sherman Act. Where the patented machines were originated and first put upon the market by the defendants, it is difficult to find any reason why they should not be grouped; but where there is no obstruction to a former freedom of trade, where there is no refusal of any article upon the former terms, it cannot be illegal to offer a group for a price which is lower than the sum of the separate prices—or, what is the same thing, to offer each article at a lower price if other articles also are taken at a lower price.

We are unable to see that a shoe manufacturer has any just cause of complaint that the defendants offer him and their other customers restricted leases. One who refuses these leases, and takes the independent leases, may complain that other shoe manufacturers are getting their machinery on lower terms; but the royalty rate will be the same, and the cost of initial payments is fixed and may be weighed as against the estimated value of taking machinery from other manufacturers. It is a mere question of dollars and cents. It is legal for the defendants to discriminate in price between customers who take

large amounts and those who take small amounts. In fact, it appears that certain large manufacturers have contended that it was unjust to them to fix the same royalty for a large manufacturer as for a small one, which has been the practice of the United Company.

We conclude, then, although the prohibitive leases, in so far as they tend to group together machines of different departments, may be regarded as a direct outgrowth of the consolidation, that the consolidation was not for this reason in any way detrimental to the shoe manufacurer, but, on the contrary, was for his benefit, since it enabled the United Company to offer him better terms, and enabled him to equip his factory cheaper than before. The argument of the United States upon the tying of department to department shows no reason for invoking the Sherman Act in behalf of the shoe manufacturer.

The effect upon other manufacturers of shoe machinery is a distinct topic to be considered later.

The leases are also complained of as restricting the shoe manufacturer's freedom of choice in taking the machines of other manufacturers, as preventing him from using the machines of others, and as compelling him to use the machinery of the defendants.

We may for the present disregard the fact that the United Shoe Machinery Company was organized by combining distinct companies.

The "exclusive use" clause relates only to machines of a particular kind or department, thus differing essentially from the prohibitive clause. It was in use before the consolidation, and after the consolidation was not changed in this respect. Though it does not relate to grouping what before was separate, this clause imposes a limitation upon the right to use machines of a particular kind. The legal effect of it is merely a reservation of a right to cancel the lease in case the lessee should fail or cease to use the defendants' machines exclusively for work of a particular kind. It does not have the legal effect of a contract by the lessee not to use the machines of others. It is merely a limitation imposed by a patentee upon the right to use.

The reiteration by the United States of the statement that the lessee must use, or is required to use, defendants' machines exclusively is misleading. The distinction between a contract requiring a lessee not to take other machines, and a limitation of the right to use the leased machines, is very material.

The supplemental brief of the United States contends:

"There can be no defense under the patent laws as to any provision complained of in the leases, unless it be as to the use of the prohibitive clause."

But no distinction can be made in this respect between the exclusive use clause and the prohibitive clause. Both are limitations imposed by a patentee upon the use of his invention. The exclusive use clause is effective only when the lessee is operating machines of other manufacturers for doing work of a kind for which defendants' machines are available.

Here, again, the right of a patentee to so limit the license would seem to be directly sustained by the statement in Henry v. Dick Co., 224 U. S. 1, 35, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, already referred to.

The United States complains that it is the policy of the defendants to say to a lessee that for doing work of a particular kind he must use all or none of its machines.

If the general insistence upon the exclusive use clause is evidence of refusal by the defendants to lease their machinery for use with the same kind of machinery taken from other manufacturers, yet this refusal precedes any contractual relation between the defendants and the licensees. At this time the parties are unquestionably free to contract or not to contract, and by refusing the terms offered the shoe manufacturer loses nothing which he had before. "The public is always free to take or refuse the patented article on the terms imposed." Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

The United States replies that the shoe manufacturers are not free to take or refuse; "they have entered into contracts which constitute an endless chain with respect to the use of the United Company's machines."

It is in evidence that during the existence of the United Company many new factories have been established and new installations made for persons who have voluntarily accepted these terms. Can the shoe manufacturers be permitted to complain, or the United States upon their behalf to complain, of what has thus been agreed to? These agreements have been entered into voluntarily by parties assenting on terms of equality. Can it now be urged that the acceptance of a limited right shall be declared a sufficient ground for making the right unlimited? Being free to choose in the first instance, and having chosen, can a lessee now urge that he is not free to use the defendants' property as he pleases as a reason for dispensing with the necessity of procuring that right from the owner of the machinery which he has installed?

It is merely rhetorical to say that these contracts constitute an endless chain. We have seen that as to the prohibitive clause there is a mere question of price. As to the exclusive clause there is a mere question of choosing between two different sets of equipment for one operation. The recent decision of the Supreme Court in Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. ——, January 25, 1915, should put an end in this case to any argument upon behalf of the shoe manufacturers which alleges compulsion or coercion, or which asserts a freedom to use the property of another without procuring from him the right to do so:

"For constitutional freedom of contract does not mean that a party is to be as free after making a contract as before; he is not free to break it without accountability. Freedom of contract, from the very nature of the thing, can be enjoyed only by being exercised; and each particular exercise of it involves making an engagement which, if fulfilled, prevents for the time any inconsistent course of conduct."

We must keep this in mind: That it is no part of the policy of the Sherman Act to relieve men of full age from the obligation of their contracts, nor to interfere with contracts, except so far as they may restrain trade of contracting parties, or be aimed at the trade of third parties with a design to effect their exclusion from trade otherwise

than by supplying a demand in fair and lawful competition. It could not be said that the trade of the shoe manufacturer was restrained by the denial to him in the first instance of the use of patented machinery, whether arbitrarily or by offering terms he could not accept. It would be equally unsound to say that his trade is restrained by a contract which provides for him at a very low price the most efficient machinery known at the time of the contract.

It is probably enough to say that, under the uniform rule recognized in many decisions, the defendants have the right, both as owners and as patentees, to refuse the use of the patented machines of any department as they may see fit, whether unreasonably or reasonably. However, as it seems to be contended that these rights have been impaired, to some extent, by the Sherman Act, we may consider whether or not the exclusive use clause is inserted for reasonable and proper purposes.

It cannot be said that it is unreasonable or against public policy for the defendants to deal with shoe manufacturers only on the basis of a full equipment for a particular operation, when the subject-matter of the contract is not machines alone, but patented inventions as well. The inventions may reasonably be regarded as the principal subject-matter of the contract rather than the number of machines necessary to a particular manufacturer. While the manufacturer may prefer to contract with reference to each machine as a unit, the defendants may prefer to regard the number of machines with which a manufacturer is to be furnished as incidental merely to a policy of licensing those only who will pay royalty according to the amount of work they have for machinery embodying the patented inventions. The amount of royalties to be paid by the manufacturer is, of course, a primary consideration.

While in the early stages of the case there were some criticisms of any leasing system as opposed to a system of selling, the very great advantages to shoe manufacturers in general of being provided with machine equipment of the highest efficiency, and of being relieved of individual effort in that most costly and difficult part of manufacturing, and the general satisfaction with the system were so overwhelmingly proved, that all doubt that the leasing system in general is unimpeachable has been removed. Furnishing capital to shoe manufacturers in the form of shoe machinery embodying costly inventions as well as great mechanical skill in manufacture, the defendants are fully entitled to claim a proper share of the advantages resulting from what they have produced. How to obtain a just return for what they have contributed to the practical art has long been a problem with inventors. With many of them it has been a cause of complaint that a just share was denied them in what was attributable to their efforts. They have been accustomed, so far as they have been able, to reserve such rights as would secure to them a proper share in whatever business might be developed under the protection of patents covering their inventions.

In determining what is a reasonable share of profit when payment is to be made upon a royalty system, the value of the machinery as

a means of production must, of course, be considered. A contract that a lessee should pay in advance a gross sum computed upon the capacity of the machine, or a rental computed upon the capacity of the machine alone, could not be criticized as unreasonable. A royalty system, however, in which payment is made only according to use, is generally more acceptable.

If we are to consider such contract with regard to the rights of the lessor as well as to the rights and preferences of the lessee, it would be difficult to devise a more equitable arrangement than a requirement that the lessee should pay royalties according to the availability of the patented machinery for his use, rather than for such use of it as he may from time to time prefer to make. The lessor demands payment only so far as his machines are actually useful or available for the use of the lessee.

It is suggested in the brief of the United States that the lessor might accomplish all proper purposes by the fixing of a minimum amount of royalties; but such a suggestion does not solve the difficulty, for a minimum amount fixed in advance should include not only present use, but such future use of the invention as might be developed. A royalty which has regard both to the capacity of the machines which the lessor furnishes and to the amount of work which the lessee may have to do upon machines embodying the patented inventions, seems beyond reasonable criticism. It is of course essential not only to fix a royalty rate but to provide a rate of use and a period of time for the use. A contract of this character must have permanency, and may be reasonably continued over a long period of years. A royalty may be likened to interest upon a principal.

A contract involving so largely the subject-matter of inventions and of patent rights, and relating to the use of the tangible property of the defendants in the form of machinery and of intangible property in the form of patent rights, is substantially different from ordinary transactions of commerce, in that it relates so largely to the use merely of property, the title to which has not changed, and which continues for a long period in a fixed location, out of the path of interstate commerce. Browning v. Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828. Where the annual use is small it would seem necessary that the period be protracted, in order to secure a fair return upon the investment. Where machinery is furnished which is of a capacity beyond the work which the lessee has to do, the efficiency of the machine, its great productivity, which is due to constant improvements, is not fully availed of; and it may be said that there is value lost owing to the limited business of such lessee. Where the product of a manufacturer is very large, and where the capacity of many machines is availed of, the manufacturer may think that the important thing is the gross amount which he is called upon to pay, and that there should be some reduction in the rate of royalty or in the amount of use required. On the other hand, it might well seem to the Shoe Machinery Company that if its equipment had proved especially valuable to a particular business it should receive its full share on a pro rata basis.

There would seem to be little chance for a difference of opinion

upon the question whether a shoe manufacturer who had been furnished with machinery of greater capacity than he was able to avail himself of should diminish his return of royalties by the employment of the machinery of others. The presence and use of other machinery would in such case be so directly inconsistent with the reasonable requirement that he should pay royalties to the extent of the use for which the leased machine was available, and use the machine to its full capacity so far as he had work for it, that the use of other than the leased machinery should be a sufficient cause for termination of the lease. It is said to be the case with a very large number—perhaps the majority in number—of shoe manufacturers that the machine equipment furnished them is more than sufficient for their work. The exclusive use clause, therefore, seems a necessary provision in these cases for securing what, from any point of view, must be regarded merely as reasonable compensation to the lessor.

With the large manufacturer the question is somewhat different. There will still exist the practical difficulty, if he introduces the machines of others, of determining what shoes are operated upon by such machinery and what by the defendants' machinery; but is there reason for denying to the defendants the right to invoke the exclusive use clause merely as a means of securing to themselves their royalty upon the entire work of that kind done by the manufacturer?

Here, undoubtedly, is a chance for a decided difference of opinion between the large manufacturer and the Shoe Machinery Company as to what part of the business success should be attributed to the defendants' patented machinery and what to the business ability of the shoe manufacturer, and for decided difference of opinion as to whether the claim of the Shoe Machinery Company to a royalty on all the work of a particular kind is reasonable. And here seems to be the only situation in which any question of the reasonable character of the exclusive use clause can arise. The terms, however, were fixed at the beginning, while both parties were free to contract or not. The machinery was installed with full notice that the lessee's right to its continued use was subject to the right of the Shoe Machinery Company to insist upon having royalties for all the work or to remove its machines if the lessee refused, as he has the right to do, to continue on that basis.

There is here no question of restraint of the trade of the shoe manufacturer, and no question whether a restraint of trade is reasonable or unreasonable. The lessee has contracted away no right which, but for the contract, he might freely exercise. The defendants stand ready to supply the manufacturer with machinery for the profitable carrying on of his trade. The shoe manufacturer has a full right to choose, and if the exclusive use clause is invoked is free from all obligation under his lease.

Furthermore, a contract providing that a manufacturer's business be carried on with machinery entirely adequate for the conduct of his trade, and which is the best machinery known for the purpose, does not injuriously affect him or the public. The reasons which underly the rule of public policy that forbids contracts in restraint of trade are absent.

A contract, requiring the use of certain machinery in a manufacturing business, between one who is to carry it on and one who is to furnish capital, or his own property tangible or intangible as a means for carrying it on, is a provision "for the prosecution of the business in a particular mode and not for its restraint." See Kinsman v. Parkhurst, 18 How. 289, 293, 15 L. Ed. 385; Chicago, St. L. & N. O. R. Co. v. Pullman, 139 U. S. 79, 89, 11 Sup. Ct. 490, 35 L. Ed. 97.

This cannot be treated as a petition for the reformation of contracts made between the defendants and the shoe manufacturers. An appeal to the public policy evidenced by the Anti-Trust Act cannot be made to extend the rights of the shoe manufacturers, under their contracts. There being no restraint of his trade, the United States shows no ground for intervention on behalf of the shoe manufacturer.

The "additional machinery clause," though not included in the government's definition of a tying clause, requires a brief consideration.

This is a contract by the lessee that, if he has work for more machines than were first installed, he will take from the defendants such additional machinery of the same kind as is necessary for doing all his work of a particular kind. This was an old form of contract in use before the consolidation, and to some extent afterwards, though abandoned some time before the filing of the petition.

The grounds upon which the exclusive use clause is held reasonable support this clause also. The exclusive use clause, however, represents the present policy of the company.

The "full capacity clause," by which the lessee agrees to use defendants' leased machinery to its full capacity so far as he has work for which it is capable of use, has already been referred to. The direct purpose of this is to secure a substantial amount of royalties. It is inconsistent with the use of the machines of others, but of this no just complaint can be made. Having a license for the use of patented inventions, the lessee must pay the agreed consideration, and if the licensor insists he must pay it whether he in fact uses the machinery or not.

The agreement to use to full capacity is auxiliary to the purpose of fixing the gross amount of royalties. It relates to machines with a recording mechanism which shows the number of shoes operated upon. Upon a breach of the agreement to use to full capacity it is difficult to see that there could be any basis for damages other than the amount of royalties that would have been paid had the machines been so used. An alleged breach of a somewhat similar provision for determining a quantity upon which royalty was to be paid was held not to be an independent cause of action; the provision being merely a subordinate part of an agreement to pay royalties. Jobbins v. Kendall Mfg. Co. (D. C.) 196 Fed. 216. See, also, In re O'Gorman Co. (D. C.) 195 Fed. 650.

But the general impracticability of determining the amount due, except in the way contemplated, fully justifies the provision for a cancellation of the lease upon a discontinuance of the use of the machine and the production of the proper record.

The United States concedes that if the "full capacity clause" stood

alone, thereby requiring the use of the leased machine alone as long as it could perform all work of that kind which the lessee had to do, it would be subject to little criticism. The objection is to its use in conjunction with the "exclusive use" or "additional machinery" clause. This conjunction of clauses, it is said, inserted in a large number of leases, shows a policy to force or create in the defendants the power to force its lessees to use exclusively machines of that class. This it is asserted is unlawful.

But the mass of leases has, in this respect, no cumulative effect upon the shoe manufacturer, for each lease taken singly gives to the lessee notice that his right to use may be terminated if he fails or ceases to use exclusively. The question as to him is whether such a reservation of right made by the lessor of patented machinery is unlawful.

If there is any "force" exerted upon him, it is from his lease alone, and not from the mass of leases taken by others, and, as we have seen, is merely the result of a limited grant made by a patentee, who may refuse him any right of use. But here, as we have seen, is nothing that can justly be deemed coercion.

Complaint is also made in behalf of the shoe manufacturer that the term of the licenses is too long—17 years—and it is said that this period is regardless of the terms of the patents. Allegations were made that these long terms were fixed for the purpose of tying up by contract what would soon be free from control through letters patent. It is true that the United States referred to certain licenses which ran beyond the terms of any patents mentioned in them. The evidence shows, however, that the leased machines were, as matter of fact, protected by letters patent throughout the period of the leases. Seventeen years, of course, is the term of a patent. Nothing is more common in agreements concerning patented inventions than to contemplate and provide for improvements. The shoe manufacturers who have assented to this period cannot complain of it. They have secured very valuable rights at a very reasonable sum for a long period of years. The history of the company and the experience of the manufacturers, who have not been required to sink their capital in machinery which, as the evidence shows, will afford them no banking credit, shows no just cause for complaint as to the length of the contracts. The evidence shows that full value has been furnished by the defendants for the royalties which they have received.

In considering the reasonableness, as between the defendant company and the shoe manufacturer, of a long term contract, we must look not alone to the fact that the shoe manufacturer may be bound for a long term. It is a case of reciprocal obligation, for the shoe manufacturer is bound for no longer period than that for which the defendants, upon a just construction of the lease contracts, are also bound. The requirement of use to full capacity, so far as the manufacturer has work, and the exclusive use or additional machinery clause, impose upon the defendants the corresponding duty to furnish machines and the shoe manufacturer is relieved from his obligation unless the defendants supply him with the means for fulfilling it.

It has been suggested that the terms of these contracts may be in-

definitely prolonged by furnishing additional machines only for new periods of seventeen years. Apparently there is no force in this suggestion; for a failure of the defendants to furnish what was necessary for carrying out the requirements of the contract, or the refusal to do so except on terms inconsistent with the original contract, would release the lessee from his obligation.

The insistence of the defendants upon the taking at the outset of an amount of machinery adequate for a lessee's entire work is, as we have said, unquestionably within their right. When additional machinery is sought, and the defendants insist upon the same general terms, their right to do so cannot be abridged by the fact that there has been a previous installation of machines. The policy is not altered from that of which the lessee was apprised at the outset.

The cancellation clauses, however, provide a practical means of escape for those who consider the term too long. They may install other machinery and run the chance, and if the machinery so installed is satisfactory they may use it for their full equipment when the machines of the defendants are removed.

It is contended for the defendants, and there is evidence in support of such contention, that the actual practice of the Shoe Machinery Company is not fairly represented by reference to the literal terms of the leases, but that it is much more liberal, and that it is customary to make modifications in particular cases.

The general policy of the company has been clearly brought to the attention of its lessees, and was exercised fairly and reasonably in those specific instances which the United States has brought to our attention.

It is stated upon the brief of the United States that the record shows that a number of the largest shoe manufacturers in the United States, lessees of defendants, are dissatisfied with their system of leasing. A number of these gentlemen have testified before us as to their very large production of shoes. They made no claim that the leases of which they complain have not furnished them with machinery entirely adequate for their business. Though the argument of the United States has urged upon us the unfortunate position of a shoe manufacturer after he has entered into contract with the Shoe Machinery Company, and deplores his supposed obligation to use the defendants' machinery throughout the contract period, yet these very intelligent gentlemen cannot be regarded as objects of unjust oppression or coercion, unless that term be used in the very loose sense which was rejected by the Supreme Court in the case of Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. ——, January 25, 1915.

The hardship to a manufacturer if, during this long period, there should come upon the market superior machinery has also been urged. During the period of the leases no such situation has apparently arisen. This argument was very sensibly dismissed in the United Shoe Machinery Co. v. Brunet, [1909] A. C. 330, as based upon too remote a contingency. Such contingency was within the purview of the parties at the time they entered into the contract, and the choice of the restricted instead of the independent form of lease would seem to indi-

cate that the practical value of being able to meet it was not considered by the shoe manufacturers greater than the amount of the initial premiums for independent machines. A business contract, like a statute, is not to be upset "upon hypothetical and unreal possibilities if it would be good upon the facts as they are." Pullman v. Knott, 235 U. S. 23, 35 Sup. Ct. 2, 59 L. Ed. ——.

As has been said, the Sherman Act was not designed to relieve parties from the obligation of contracts fairly entered into. It cannot be invoked in this case to abridge the right of contract in order to establish what Justice Holmes terms "the equality of position between the parties, in which the liberty of contract begins." Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. ——. Here the parties stand upon terms of entire equality. The large shoe manufacturers and the defendants seem to differ as to what are fair and reasonable terms, but the Sherman Act cannot be invoked to settle a trade dispute of this character between such parties.

To justify interposition in behalf of the public it must appear that the interests are those of the public generally, as distinguished from those of a particular class. The legislature may not, in the guise of protecting the public interests, arbitrarily interfere with private business. Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385. The rules of public policy which make a given contract void are not to be extended arbitrarily. Baltimore & Ohio v. Voigt, 176 U. S. 498, 505, 20 Sup. Ct. 385, 44 L. Ed. 560.

There remains to consider upon this branch of the case, and as directly bearing upon the reasonableness of these contracts, the important fact that a very large number of very intelligent and competent men, heads of manufacturing establishments, have independently accepted these terms. The large number of leases is strong evidence that upon the whole the terms are reasonable, and that the requirements from the lessee, of which complaint is made, have not been regarded as more than could be advantageously accepted. Such manufacturers have had free option to manufacture boots and shoes of other kinds. They may have from the defendants by purchase, if they like, the assistance of some 170 machines from their general department. They may have manufactured for them, if they see fit, those commercially practicable welters and stitchers upon which patents have expired, or they may manufacture largely by hand methods. It must be remembered that the defendants' machines are largely labor-saving devices. The situation is not that of a monopoly, and the case of the United States upon that aspect has completely broken down. These contracts which the United States attacks, moreover, give to the lessees, many of whom seem entirely satisfied with them, very valuable rights. Nothing more impractical can be imagined than the prayer of·the petition that these contracts should be canceled. To restore the parties to the original situation would probably result merely in agreements which would meet the objections of the United States, and would yet be in substance the same   Payment of royalties according to use necessarily involves some provision as to the amount of use. The exclusive use clause can only be criticized as requiring too much use, and therefore

too high a price.  It is, after all, a question of price, and the right of the defendants to fix their prices covers so many different modes that if this particular mode of payment is found objectionable, other modes less convenient, but accomplishing the same result, could readily be adopted.

The United States also objects to the fact that certain auxiliary machines for use in conjunction with the Goodyear welter and stitcher are supplied only to those who take the Goodyear welter and stitcher. These auxiliary machines are supplied without royalty, and for the purpose of increasing the production of the welter and stitcher; but there is no proof that the combination affected these.  The right of a person to promote the sale or use of one class of goods by giving also other goods or tokens for goods, though it has been attacked by legislation, has been upheld in decisions which hold such legislation by a state unconstitutional.  Van Deman & Lewis v. Rast (D. C.) 214 Fed. 827, 833; Little v. Tanner (D. C.) 208 Fed. 605, 610; State v. Dalton, 22 R. I. 77, 46 Atl. 234, 48 L. R. A. 775, 84 Am. St. Rep. 818.

The rule that a decree cannot be made which injuriously affects the rights of third parties would seem to require that before the court in any event could proceed to a decree to annul these leases the lessees should be before the court as parties.  Minnesota v. Northern Securities Co., 184 U. S. 234, 235, 22 Sup. Ct. 308, 46 L. Ed. 499; Shield v. Barrow, 17 How. 130, 15 L. Ed. 158; Gregory v. Stetson, 133 U. S. 579, 10 Sup. Ct. 422, 33 L. Ed. 792.

### The Effect of the Leases upon Other Manufacturers of Shoe Machinery.

Here we have to consider the effect of the mass of defendants' leases upon persons who are not parties to them, and who, therefore, have not entered into any contracts in alleged restraint of their trade.  The inquiry must be, therefore, whether, by reason of the insertion in a large number of leases of those clauses of which the United States complains, competition is suppressed to such extent as to tend to monopoly of interstate commerce in a field which otherwise would be open to competition.

It is most important to observe that the petition presented the leasing system as a part merely of a general plan of monopoly.  The main brief of the United States so treated it.

The subject-matter to which these leases relate is a part only of the machinery dealt in by defendants.  The supposed field of monopoly has now shrunk so that it is much narrower than the general field of shoe machinery, or of shoe machinery for the bottoming of shoes by stitches or otherwise, in which field it appears that there never has been a monopoly, but always active competition between defendants' machines and other machines.

The supposed monopoly, or suppression of commerce, relates to machines for performing a part only of the large number of operations necessary to complete a shoe.  The leases relate to machines protected by patents; many of them were originated and first put upon the market by the defendants.  Many of these machines have such in-

dividuality that there are no others which perform the same function, or with which they could be classed.

With articles of common production the existence of competitors may be assumed; but here no such assumption is admissible.

If the question here is whether the leases have the effect of unlaw-fully excluding competitors from interstate commerce in shoe machinery, we must at the outset inquire in a general way as to the present or possible existence of competitors. In United States v. Winslow, it was said:

"The machines are patented, making them is a monopoly in any case, the exclusion of competitors from the use of them is of the very essence of the right conferred by the patents (Paper Bag Patent Case, 210 U. S. 405, 429 [28 Sup. Ct. 748, 52 L. Ed. 1122]), and it may be assumed that the success of the several groups was due to their patents having been the best."

As the subject-matter of the leases is patented machinery, the presumption is that there are no competitors who can offer the same machinery. Whether there are competitors able to supply other kinds of machinery, patented or unpatented, which can be used for work of the same general description as that for which defendants' patented machines are adapted and used is matter of conjecture.

The competitor who is excluded from supplying the defendants' lessees, because the lessee is compelled to choose between his machines and the defendants' machines, may be, and as to many of the machines is likely to be, an imaginary being.

It appears, however, that for some of the operations for which the leased machines are adapted there are upon the market machines made by other manufacturers, and that in a general sense there are competitors.

To determine how far the leases have had the actual effect of excluding competitors, it would be necessary to consider in much detail the special subject-matter of the leases, the dates of patents, and the special and peculiar operations performed by the machines.

The defendants insist that in order to meet a charge so much narrower than that of the petition it would be necessary for them to offer evidence as to each unit, and to prepare a defense of an entirely different character from that required to meet the petition; and this seems probable. We may, however, refer to a few considerations of a general character.

In the first place, we must make a clear distinction between that which undoubtedly the defendants have the right to do and that which it is said may improperly affect competitors.

As owners of patented machinery and as manufacturers of machinery, whether patented or unpatented, they have the right to supply to the best of their ability as many customers as can be induced to take their machinery. They have the right, for the reasons which we have stated, to enter into long term contracts with shoe manufacturers for the use of their patented machinery throughout the terms of the patents. Merely as manufacturers they have the right to enter into long term contracts for supplying their machine equipment to those who are willing to agree to long term contracts.

That, irrespective of the question of patents, a long term contract, 15 years, with exclusive rights, was not in general restraint of trade, and was not void as against public policy, was determined in Chicago, etc., R. R. Co. v. Pullman Car Co., 139 U. S. 79, 89, et seq., 11 Sup. Ct. 490, 35 L. Ed. 97.

The United States relies greatly upon United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, and seeks to establish an analogy between the so-called "65 per cent. contracts" in that case and the large number of contracts of the defendants with shoe manufacturers in this case. But the resemblance between the Reading Case and the present case lies only in the fact that in each is a large number of contracts. In the Reading Case an existing and definite supply of coal was monopolized, and a definite part of that supply was monopolized through the 65 per cent. contracts. In this case, so far as the leases are concerned, there is no question of monopolizing an existing supply. The monopoly, if any, is a monopoly of customers for machines for performing the particular operations to which the leases relate. The complaint is that defendants' customers are so bound by the leases that they are no longer customers for other manufacturers of shoe machinery.

The monopolizing of a definite and limited supply of a commodity and the monopolizing of customers for machines for performing certain operations in the manufacture of shoes are as far apart as possible. The number of customers, or possible customers, for shoe machinery has been very largely increased during the life of the defendant company. Many of these customers were first induced to be customers for shoe machinery by the fact that machine equipments were offered them adequate for the establishment of a manufactory of shoes. The customers are not a fixed quantity. They comprise such persons out of the entire population of the United States as may be induced to engage in a manufacturing business by knowledge that they can procure adequate machinery for that purpose on suitable terms.

We must take into consideration not only natural persons, but also those artificial persons easily created under general laws of incorporation for the conduct of any enterprise requiring a considerable amount of capital. A large number of shoe manufacturers concerning whom there is evidence in this case are corporations, and the leases relate to the activities of corporations. The individuals who are stockholders or officers of such corporations may in new corporate forms engage in shoe manufacture.

Upon the face of it any undertaking to monopolize such an undefined field as that of customers for shoe machinery seems impracticable.

Counsel for the United States inquire what possible hope there is for other manufacturers to deal with the customers of the Shoe Machinery Company, so long as their leasing contracts prevail. This inquiry would be substantially the same if all those provisions in the leases to which objection is made were stricken out.

Assume the existence of a large body of leases for only the period of patents and requiring merely payment for a right to use, but with the additional machinery clause, the exclusive use clause, and the prohibitive clause omitted; the inquiry would still be the same. It may

be said, however, that with these clauses in it is somewhat more difficult to deal with a customer who has secured from defendants either a complete or partial equipment.

The exclusion from trade which results from the fact that many customers are supplied cannot be complained of by the United States. The complaint must be limited to such exclusion as results from the clauses objected to.

Perhaps the simplest way of treating the leases in this connection is to consider whether if the defendants had agreed in express terms to furnish for 17 years entire equipments for shoe factories, and the shoe manufacturers had agreed to operate these equipments exclusively for that period, this could be condemned.

The true effect of the leases is much less than this, but if such agreements can be condemned it must be upon the theory that both the defendants and the shoe manufacturers have lost the freedom of contract which existed before the Sherman Act, and that contracts advantageous to both, and agreed upon by both, are invalid because they take customers out of the market.

The Sherman Act seeks to maintain competition as a means to the end that trades may be made and closed, and not to forbid contracts in order that competition for particular customers may be perpetually maintained.

A public auction affords perhaps the fairest means for competition, but when the hammer falls the purpose for which the public auctioneer was employed is accomplished; competition has achieved its end— a binding contract.

If, between the parties, the contract is fair and has relation to the consideration which each is to render, if nothing which has no relation to this is inserted, the contract must be upheld, even though it may destroy a third person's chances for competition. We must find in the leases, or in the conduct of the defendants in offering them, or in enforcing them, something which "transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it." Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 48, 33 Sup. Ct. 9, 57 L. Ed. 107.

If, for the sake of the competing manufacturer of shoe machinery, it was sought to obviate the objection that the leases are too long, a reservation to the shoe manufacturer of a choice to terminate his lease at any time would seem to be all that could reasonably be asked. If allowed an opportunity to choose at any time between the machines he has taken and the machines of others, this should answer the objection to the length of the leases.

But the shoe manufacturer has such a choice.

The exclusive use and cancellation clauses serve to facilitate this choice and not to prevent it. If the defendants exercise their rights under these clauses he is freed completely, and thus becomes a possible customer for a competitor. If the defendants do not exercise their rights, he continues bound by his agreement for the payment of royalties; but, subject to this, he may, as we have seen, without actionable breach of contract, install at once the machinery of others.

The contention of the United States that it is unlawful to make the shoe manufacturer, by the exclusive use clause, choose between the defendants' machines and other machines, we have seen cannot be sustained on behalf of the shoe manufacturer. Nor can it be sustained on behalf of the manufacturer of shoe machinery, for it opens to him a chance for competition. All cancellation clauses if exercised are in one way favorable to him. They are unfavorable only so far as the shoe manufacturer may desire to retain the machinery of the defendants.

In reality what stands in the way of a competitor is the desire of the shoe manufacturer to retain his rights under the leases. If compelled to choose he will choose the defendants' machinery, and thus the defendants, upon such choice, will win in competition.

It is quite true that when a shoe manufacturer has installed several machines under the prohibitive leases the extra cost of changing all his prohibitive leases for independent leases may be so considerable that competition is difficult. He has taken the machines as a group, and one who has not a group to offer in substitution has little practical chance to compete. But a competitor must be able to compete. If leases for machines for use as a group are offered and accepted for sound business reasons, and if, because of the greater productivity of a group and of the less cost of maintenance, better prices can be made, the defendants and the shoe manufacturers need not forego the making of such contracts for the sake of possible competitors who may have only single machines to offer. Contracts for large equipments of machinery, furniture, and other articles are too common to be condemned for such reason.

The United States treats the question of the leases rather as an abstract or verbal question than as a practical question, or a question of substance. The grouping of machines, each protected by one or more distinct patents, is treated as a mere artifice for making one machine aid another in a trade for machinery.

The assumption that it is highly desirable that the shoe manufacturer should be at liberty to group the defendants' machines with such other machines, taken from other manufacturers, as he may see fit, ignores the fact that, though machines may be treated in the Patent Office as separate, in a shoe factory the machines have a very definite mechanical relation to each other, and to the particular method of making a shoe. The grouping of machines in order that some may aid others in turning out a product affords a sufficient mechanical reason for installing them as groups, and a sufficient business reason for dealing with them as groups.

That there are sound mechanical and business reasons for grouping together machinery as it is grouped by a series of prohibitive leases is abundantly established. The United States fails to show that the grouping of the machines is in fact made merely as an unlawful artifice, and not because of sound mechanical and business reasons. It has referred to certain leases in which there appears to be no necessary mechanical relation between some of the machines grouped. Thus to a limited extent it may be true that the grouping is for the purpose of trade or of contract, rather than because of the close relation of the

machines in process of manufacture; but this is insufficient to show that the principal purpose was not, as is contended by the defendants, to secure by efficient co-operation of machines a larger production of shoes.

A contract for a group of related machinery, or for a supply of machines, not immediately related, but used only in separate mechanical steps of a manufacturing business, is an entirely proper and normal contract. The matter cannot be better stated than by Judge Putnam in United States v. Winslow (D. C.) 195 Fed. 578, 592:

"It seems to be impossible to deny that the combination of various elements of machinery, all relating to the same art and the same school of manufactures, for the purpose of constructing economically and systematically, and of furnishing any customer, the whole or any part of an entire system, is in strict and normal compliance with modern trade progress; as also it might be in strict compliance with modern progress to limit the manufacture and supply to certain details, as, for example, steam gauges, wheels for railroads cars, or axles for steam locomotives, without furnishing anything else, although by so doing, the manufacturer of details becomes able to command the entire market. It is absolutely normal, and in accordance with the rightful demand of the market, for any dealer to supply mere details or an entire system of machinery, according as his customers may desire."

It may be admitted that the inducements offered by the United Company in the complete or partial installation of a machine equipment on terms which relieve the manufacturer from the expense of an initial payment and from the loss by deterioration, make it a very formidable competitor. It may be assumed that the difficulty of introducing competing machines into factories so supplied is very great; but that this difficulty arises from the insertion of clauses in the leases which were directed at competitors, and were not inserted for the purpose of defining and securing a reasonable compensation to the defendants for the use of their patents and machinery, has not been made to appear.

The main purpose, to insure such permanency of the relation between lessor and lessees as has been agreed upon, being legitimate, and the judgment of a large number of practical men who have separately, and without concurrent action, accepted what was offered them by the United Company upon the terms offered, being the best proof of the reasonableness of these terms, we must hold that the difficulty of a competitor arises from the fact that customers are already supplied rather than from any provisions designed to hold these customers to what they have agreed to, or which provide for the termination of the leases and the freeing of the manufacturer from his contracts with the United Company.

The free field in competition to which a new manufacturer of shoe machinery is at this date entitled is not a field where there is no prior art, nor where the shoe manufacturers are unsupplied with machinery, nor where there is an unsatisfied demand for machinery in every factory. One who goes into a field of manufacture already occupied must expect to find factories so fully equipped that they are no longer customers.

Counsel for the United States do not, however, sufficiently recognize the difference between the commercial situation relating to pat-

ented articles and that relating to articles of general production. The inventor seeks to displace by invention inferior methods, and such displacement is encouraged by giving to the patentee a free field for his invention, and by giving him the right to offer it upon such terms as he may induce the public to accept. During the period of monopoly he may establish a good will which will give him after the expiration of his patents a formidable advantage in competition over imitative manufacturers. Frequently this good will and the development of his business may be such as to practically and lawfully exclude competition after the expiration of his patents. When a thing is so successfully accomplished and perfected as to satisfy all requirements, further invention in that field is often discouraged. The manufacture of complicated machines, in order to be profitable, must be on a large scale and by an organization having mechanical skill.

The defendants saw before them a large field for the business of supplying labor-saving machines to shoe manufacturers. They saw, as was expressed in a circular of the Goodyear Shoe Machinery Company, dated February 8, 1889:

"The great advantages to be secured by the control in one corporation, both in the United States and in foreign countries, of the most efficient types of shoe machinery."

This circular, instead of affording evidence of an improper purpose, shows a plan whose development has been of great advantage to the industry of shoe making, and which has been determined to be lawful by the Supreme Court in United States v. Winslow, 227 U. S. 202, 217, 33 Sup. Ct. 253, 57 L. Ed. 481.

It was but natural that a company dealing with shoe manufacturers, in respect to a device for labor saving upon one operation of shoe manufacture, should extend its business so as to be able to supply labor-saving devices for other distinct operations. As the operations in making a shoe are said to be 150, more or less, it was a natural development, after effecting a saving in one operation, to invent mechanical means for saving in other operations. Instead of closing the door to invention, invention in the art of shoe machinery was thus greatly developed and greatly encouraged.

A company of sufficient capital to furnish a large line of labor-saving devices for different operations in shoe making, which devices must necessarily be more or less related to each other, would properly strive to furnish, not only single machines, but groups of machines, or an entire machine equipment. The enterprise of the defendants in developing and occupying a field in this way rendered it impossible, of course, for any subsequent organization to have the advantages of an unoccupied field. It is impossible to believe that the defendants' equipment is in so many shoe factories for any other substantial reason than the merits of what they have had to offer. To say that this is due, in any substantial degree, to the fact that its leases run beyond the terms of patents, or because of the exclusive use, prohibitive, or cancellation clauses, rests largely, if not entirely, upon assumption. But that the business of these defendants rests upon the lease provisions objected

to in such a substantial amount as to constitute any factor of independent force in securing or maintaining a monopoly does not appear.

The clauses objected to are all subordinate and auxiliary to maintaining rights, which unquestionably belong to the defendants, to charge their own prices and to choose as customers those who will pay those prices.

The attack of the United States is not upon these rights, but upon the particular mode in which they have sought to exercise them. Other modes, such as the requirement of arbitrary payment for the full period of the patents, would escape all such attacks. The attack arises from the attempt to adjust the payments to the amount of use which particular manufacturers may have for the patented inventions.

The defendants very forcibly contend that no decree for the United States can be based upon the leases alone, as an independent ground for relief, for the reason that the leases were presented merely as parts of a general plan of monopoly. They in turn rely upon United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243; but to show that the petition cannot be sustained under the first section of the Anti-Trust Act, and insist also that the question whether the leases are contracts in restraint of trade cannot be determined because the lessees have not been joined as parties, and are not before the court.

They further insist that the subject-matter of the leases is substantially different from the subject-matter of the petition, and requires that the defendants be given an opportunity to introduce specific evidence as to the different patents and different machines.

The defendants during the trial have waived no rights in respect to these contentions.

In view of the fact that my conclusions upon the merits of the lease question are favorable to the defendants, I pass these objections without a decision upon their validity.

In view of the full discussion of the other portions of the case by my Associates, I need only state my general concurrence in their conclusions, and that I concur in all respects in the opinion of Judge DODGE upon the lease question, as well as upon all other questions in the case.